**TEXAS OIL & GAS CORPORATION,**
Plaintiff,

v.

**The UNITED STATES of America et al.,**
**Defendants-Appellees,**

**The Pecos County State Bank,**
**Defendant-Appellant.**

**No. 72–1117.**

United States Court of Appeals,
Fifth Circuit.

Sept. 7, 1972.

Rehearing and Rehearing En Banc
Denied Oct. 31, 1972.

---

William Monroe Kerr, Midland, Tex., James R. Kerr, Fort Stockton, Tex., Kerr, Fitz-Gerald & Kerr, Midland, Tex., for defendant-appellant.

Charles M. Prock, Fort Stockton, Tex., for Texas Oil.

William S. Sessions, U. S. Atty., El Paso, Tex., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, William S. Estabrook, Elmer J. Kelsey, Janet R. Spragens, Attys., Tax Div., Dept. of Justice, Washington, D. C., for United States.

Before BELL, GOLDBERG and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

We enter with some trepidation the tortured meanderings of federal tax lien law, intersected now by the somewhat smoother byway of the Uniform Commercial Code. Standing at this vantagepoint in the instant case, we must decide the disposition of a fund of the taxpayer-debtor's accounts receivable that is claimed both by the Government under its tax lien authority and by the lender under the aegis of the Uniform Commercial Code. Amendments to the tax lien

statutes in 1966 give us some shelter in our decision; under this lien-to we conclude that the tax lien must take priority over the claim of the private lien holder, and we affirm the judgment of the lower court, D.C., 340 F.Supp. 409.

The real parties in interest in this appeal are the Pecos Bank and the Internal Revenue Service. The nominal appellant Texas Oil & Gas Corporation, is merely the stakeholder in an interpleader action to determine the allocation of competing claims against $14,690.10, which Texas Oil & Gas admittedly owes for services rendered by the taxpayer, Hilton R. Blackmon, d/b/a Blackie's Oil & Gas Field Services. Internal Revenue's claim to the fund is based upon federal tax liens duly filed against the taxpayer in Pecos County, Texas, on February 27, 1970, for almost $55,000 in unpaid withholding and FICA taxes assessed in 1969. *See* 26 U.S.C.A. §§ 6321, 6323(f).[1]

---

1. "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

26 U.S.C.A. § 6321.

"*Place for filing notice; form.—*
(1) Place for filing.—The notice referred to in subsection (a) shall be filed
—
(A) Under State laws.—
(i) Real property.—In the case of real property, in one office within the State (or the county, or other governmental subdivision), as designated by the laws of such State, in which the property subject to the lien is situated; and
(ii) Personal property.—In the case of personal property, whether tangible or intangible, in one office within the State (or the county, or other governmental sub-division), as designated by the laws of such State, in which the property subject to the lien is situated; or
(B) With clerk of district court.—In the office of the clerk of the United States district court for the judicial dis-

trict in which the property subject to the lien is situated, whenever the State has not by law designated one office which meets the requirements of subparagraph (A); or
(C) With Recorder of Deeds of the District of Columbia.—In the office of the Recorder of Deeds of the District of Columbia if the property subject to the lien is situated in the District of Columbia.
(2) Situs of property subject to lien.—For purposes of paragraph (1), property shall be deemed to be situated—
(A) Real property.—In the case of real property, at its physical location; or
(B) Personal property.—In the case of personal property, whether tangible or intangible, at the residence of the taxpayer at the time the notice of lien is filed.
For purposes of paragraph (2)(B), the residence of a corporation or partnership shall be deemed to be the place at which the principal executive office of the business is located, and the residence of a taxpayer whose residence is without the United States shall be deemed to be in the District of Columbia.
(3) Form.—The form and content of the notice referred to in subsection (a) shall be prescribed by the Secretary or his delegate. Such notice shall be

Pecos Bank claims an interest in the fund by virtue of a security agreement between the bank and taxpayer-debtor executed on March 25, 1967, and duly filed and perfected on March 29, 1967. *See* Tex.Bus. & Comm.Code Ann. §§ 9.-401–9.408, V.T.C.A. Pursuant to that security agreement the bank agreed to advance money at various times to the taxpayer-debtor in exchange for a security interest in taxpayer-debtor's accounts receivable.[2] As is frequently the case in so-called "open" agreements, the amount of money to be loaned and the times at which the money was to be advanced were not specified in the contract. *See* 26 U.S.C.A. § 6323(c)(4), relating to obligatory disbursement agreements. Under the contract the lender's eventual acquisition of the accounts receivable was uncertain, contingent upon the performance of services by the taxpayer-debtor. The bank's security interest, however, attached automatically to any new accounts receivable without additional filing or perfection required by the bank. Tex.Bus. & Comm.Code Ann. § 9.204.[3] Taxpayer agreed to factor his accounts receivable with the bank as soon as the accounts receivable arose in consideration for the loans. The bank continued to make loans and to factor taxpayer's accounts receivable under the agreement until October 15, 1970. Taxpayer-debtor completed his services to the plaintiff, Texas Oil & Gas, during the months of September, October, and November of 1970, apparently pursuant to a contract entered into in September.

During December of 1969 and January of 1970, the Government assessed federal withholding and FICA liabilities against Blackie's for the preceding tax year, 1969. A tax lien notice was duly filed on February 27, 1970, and the United States attempted to enforce part of its lien by serving notice of levy on Texas Oil & Gas. The bank first became aware of the tax lien on October 22, 1970, and shortly thereafter served notice on Texas Oil & Gas that it too claimed Blackie's accounts receivable. This interpleader action by Texas Oil & Gas followed. F.R.Civ.Proc. 22.

Tax liens have had a mixed history in the law. *See generally* Coogan, "The Effect of the Federal Tax Lien Act of 1966 Upon Security Interests Created Under the Uniform Commercial Code," 81 Harv. L.Rev. 1369 (1968); United States v. Vermont, 2 Cir. 1963, 317 F.2d 446 (Friendly, J.), aff'd, 1964, 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370. For the past two decades, however, the federal tax lien has held the upper hand in its battles with competing private liens. The genesis of that advantage, as it applies to the instant case, appears to be United States v. Security Trust & Savings Bank, 1950, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53. Prior to *Security Trust*, the

---

valid notwithstanding any other provision of law regarding the form or content of a notice of lien."

26 U.S.C.A. § 6323(f).

2. The agreement between taxpayer-debtor and the bank provides for a continuing security interest in "[a]ll accounts, contract rights, chattel paper, instruments, general intangibles and rights to payment of every kind now or at any time hereafter arising out of the business of the debtor; all interest of the debtor in any goods, the sale or lease of which shall have given or shall give rise to any of the foregoing."

3. "(a) A security interest cannot attach until there is agreement (Subdivision (3) of Section 1.201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

(b) For the purposes of this section the debtor has no rights

(1) in crops until they are planted or otherwise become growing crops, in the young of livestock until they are conceived;

(2) in fish until caught, in oil, gas or minerals until they are extracted, in timber until it is cut;

(3) in a contract right until the contract has been made;

(4) in an account until it comes into existence.

* * * "

Tex.Bus. & Comm.Code Ann. § 9.204.

courts had carved out a doctrine concerning the priority granted to a federal tax lien in competition with a private lien in situations in which the taxpayer-debtor was insolvent. 31 U.S.C.A. § 191.[4] Under the tax lien law as it developed for in-. solvent taxpayer-debtors, a private lien competing with a federal tax lien had to be "choate" and perfected. *See* Spokane County v. United States, 1929, 279 U.S. 80, 49 S.Ct. 321, 73 L.Ed. 621; *see generally* Kennedy, "The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien," 63 Yale L.J. 905 (1954); Kennedy, "From Spokane to Vermont: The Campaign of the Federal Government Against the Inchoate Lien," 50 Iowa L.Rev. 724 (1965). Choateness, a concept entirely court-made, *see* Plumb, "Federal Liens and Priorities-Agenda for the Next Decade," 77 Yale L.J. 228, 230 (1967), requires that the private lien holder establish the identity of the lienor, the property subject to the lien, and the fixed amount of the lien. *See, e. g.,* United States v. New Britain, 1953, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520; United States v. Pioneer American Insurance Co., 1963, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770. The Choateness requirement has generally been harsh in insolvency situations. *See, e. g.,* United States v. Gilbert Associates, Inc., 1953, 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071, where the Supreme Court indicated that only possession or reduction to judgment would allow a private lien to prevail over a competing federal tax lien. But United States v. Security Trust, *supra,* marked the first time in which the Supreme Court applied the choateness doctrine to a competing lien situation in which the debtor was not insolvent. And in United States v. R. F. Ball Construction Co., 1958, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.

2d 510, the Supreme Court applied its choateness doctrine to a situation in which the private lien, an assignment of sums due for performance of a subcontract which was competing with a federal tax lien, had been created entirely by contract between private parties. *See especially* United States v. R. F. Ball, *supra* (Whittaker, J., dissenting), and United States v. Pioneer American Insurance Co., 1963, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770, for an explanation of the rather abbreviated opinion of the majority in United States v. R. F. Ball, *supra.*[5] Prior to *Ball* the choateness doctrine had been applied only to statutory liens or to liens created by attachment or garnishment. At the same time that the Supreme Court was extending the perimeters of the types of private liens that were subject to the choateness doctrine, it also gave some indication that the doctrine would not operate as severely when applied to the private liens newly-added to the choateness test as it had when applied to federal priority under the insolvency statute. *See* United States v. New Britain, *supra*; Coogan, 81 Harv.L.Rev. at 1378–1379. Even for that proposition, however, there is some conflicting authority from the Supreme Court. In United States v. White Bear Brewing Co., 1956, 350 U.S. 1010, 76 S.Ct. 646, 100 L.Ed. 871, a majority of the Supreme Court reversed a lower court conclusion that a federal tax lien did not have priority over a statutory mechanics' lien " . . . even though the mechanics' lien was specific, prior in time, perfected in the sense that everything possible under state had been done to make it choate, and was being enforced before the federal tax lien arose." United States v. White Bear Brewing, 350 U.S. at 1010, 76 S.Ct. at 646, 100 L.Ed. at 871 (Douglas, J., dissenting).[6]

---

4. This statute is generally known as R.S. 3466 even though it is part of the Code.

5. "The Court has never held that mortgagees [under section 6323(a)] face a less demanding test of perfection than other interests when competing with a federal lien. Indeed United States v.

R. F. Ball Constr. Co. . . . stands for just the contrary."
United States v. Pioneer American Insurance Co., 374 U.S. at 89, 83 S.Ct. at 1656, 10 L.Ed.2d at 775.

6. As with United States v. R. F. Ball, *supra,* it is the dissenting opinion that

Two later opinions appear to reaffirm the intimation in United States v. R. F. Ball, *supra*, that the choateness tests were not so severe for liens arising under section 6321 as they were for liens arising under R.S. 3466. *See* Crest Finance Co. v. United States, 1961, 368 U. S. 347, 82 S.Ct. 384, 7 L.Ed.2d 342, and United States v. Vermont, 1964, 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370.

Against this historical background Congress in 1966 amended the tax lien provisions of section 6323 in a number of ways. The amendments are

" . . . in part an attempt to conform the lien provisions of the internal revenue laws to the concepts developed in this Uniform Commercial Code. It represents an effort to adjust the provisions in the internal revenue laws

relating to the collection of taxes of delinquent persons to the more recent developments in commercial practice (permitted and protected under State law) and to deal with a multitude of technical problems which have arisen over the past 50 years."

S.Rep.No.1708, 89th Cong., 2d Sess. (1966); *see also* H.R.Rep.No.1884, 89th Cong., 2d Sess., U.S.Code Cong. & Admin.News, p. 3722 (1966). We must construe but a small part of these amendments for purposes of this appeal, primarily the amendments to section 6323 (c).[7]

The parties have submitted their own theories of this case, and we find ourselves in the not too unusual position of rejecting large parts of both theories. It is the Government's general position,

---

brings out the facts more clearly. The majority opinion in United States v. White Bear Brewing, *supra*, is simply a per curiam reversal. *See also* United States v. White Bear Brewing Co., 7 Cir., 1954, 227 F.2d 359.

7. "(c) *Protection for certain commercial transactions financing agreements*, etc. —

(1) *In general.*—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) a commercial transactions financing agreement,

(ii) a real property construction or improvement financing agreement, or

(iii) an obligatory disbursement agreement, and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

(2) *Commercial transactions financing agreement.*—For purposes of this subsection—

(A) *Definition.*—The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or

(ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;
but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.

(B) *Limitation on qualified property.*—The term "qualified property", when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing.

(C) *Commercial financing security defined.*—The term "commercial financing security" means (i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable, (iii) mortgage on real property, and (iv) inventory.

(D) *Purchaser treated as acquiring security interest.*—A person who satisfies subparagraph (A) by reason of clause (ii) thereof shall be treated as having acquired a security interest in commercial financing security.
\* \* \* "

26 U.S.C.A. § 6323(c).

as we understand it, that the usual tests of choateness in non-insolvency situations would operate to give priority to the tax lien. The bank attempts to turn elements of the choateness doctrine back on the Government. It argues that tax-payer-debtor's accounts receivable became subject to the liens of the bank and of the Government at the same time. In effect, the bank concedes that it does not come within the protective perimeters of section 6323(c), but it contends that it should divide the accounts receivable with the Government upon a mathematical formula consonant with its own theory of simultaneous attachment.

The tax lien statute itself narrows the issue in this appeal considerably. Section 6323(c), truncated somewhat, provides that a section 6321 lien " . . . shall not be valid with respect to a security interest which came into existence after tax lien filing but which . . . is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting . . . a commercial transactions financing agreement . . . and . . . is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation." "Security interest" is defined generally for section 6323 by section 6323(h)(1):

"*Definitions.*—For purposes of this section and section 6324—

(1) Security interest.—The term 'security interest' means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth."

However, section 6323(c)(1) appears to have qualified that general definition.

Unlike the "security interest" contemplated by section 6323(h)(1)(A), a section 6323(c) interest need not always be "in existence" at the standard point-in-time reference to "existence" of section 6323(h)(1)(A), for section 6323(c) by its terms contemplates certain limited types of property acquired after the point-in-time reference, which is "as of the time of tax lien filing" for purposes of section 6323(c)(1)(B). A security interest cannot be "perfected" until it "attaches," Tex.Bus. & Comm.Code Ann. § 9.303, and the interest cannot attach prior to the time that the "debtor has rights in the collateral," Tex.Bus. & Comm.Code Ann. § 9.204(a). By definition, the debtor in section 6323(c) situations often does not attain "rights in the collateral" until after the tax lien filing, and it is to that problem that section 6323(c) directs its attention. *See* Young, "Priority of the Federal Tax Lien," 34 U.Chi.L.Rev. 723 (1967); Coogan, 81 Harv.L.Rev. at 1397, 1404–1405; *but cf.* United States v. Strollo, 67–1 U.S.Tax.Cas. 83,162 (Fla.Dist.Ct.App.1966), where it appears that a security interest in the after-acquired property in question (contract rights) did not attach immediately under the existing (pre-Uniform Commercial Code) Florida law. In addition, to qualify as a "security interest" under section 6323(h)(1)(A) and section 6323(c)(1)(B), the security interest must be "protected under local law against a subsequent judgment lien arising out of an unsecured obligation." The phrase "protected against a judgment lien" is not a term of art easily adaptable to the sometimes equally unartful language of the Uniform Commercial Code. *See* Hearings before the House Ways and Means Comm. on H.R. 11256 and H.R. 11290, 89th Cong., 2d Sess. (1966), for a suggested alternative to the present "judgment lien" test; *cf.* Mellinkoff, "The Language of the Uniform Commercial Code," 77 Yale L.J. 185 (1967). In the context of section 6323(c), however, "protected against a judgment lien" does not raise the problems that might occur in other sections of the tax lien amend-

ments. *See, e. g.,* 26 U.S.C.A. § 6323 (d); Coogan, 81 Harv.L.Rev. 1369, *supra*; Plumb, 77 Yale L.J. 228, *supra.* A security interest in after-acquired accounts receivable "is perfected when it has attached," Tex.Bus. & Comm.Code Ann. § 9.303, and the interest attaches automatically if the lender has taken "all of the applicable steps required for perfection" under Tex.Bus. & Comm.Code Ann. §§ 9.302–9.306. At the same time, a perfected security interest "is protected by local law" against a person who does not become "a lien creditor . . . before it [the security interest] is perfected," Tex.Bus. & Comm.Code Ann. § 9.301(a)(2).[8] Because a judgment creditor, like a secured creditor, cannot attach his lien to the debtor's after-acquired accounts receivable until the accounts receivable come into existence regardless of whether he has taken all the necessary actions for perfection under state law, the judgment lien could not possibly become perfected *before* the security holder's interest becomes perfected. At the most, the judgment lien could become perfected at the same time that the security interest becomes perfected, but that circumstance does not alter the security holder's priority under the Uniform Commercial Code.[9]

■■■ The agreement in question in the instant case was also a "commercial transactions financing agreement" contemplated by section 6323(c)(2)(A)(i) of the 1966 amendments:

"[A]n agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business . . ."

However, the protection given to a private lien in competition with a Government tax lien for after-acquired property secured pursuant to a non-obligatory disbursement agreement is a limited protection. Congress was understandably unwilling, as a general proposition, to allow a taxpayer-debtor to lock in his property for an indefinite period of time pursuant to a security agreement for advances that he could draw upon at will. Section 6323(c), as amended, represents the limited exceptions to that general proposition in the context of the courts' choateness doctrines:

"[S]uch an agreement shall be treated as coming within the term [commercial transactions financing agreement] only to the extent that such loan or purchase is made before the 46th day after the date of the tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing."

26 U.S.C.A. § 6323(c)(2); *see* section 6323(c)(4) with regard to funds advanced and property secured pursuant to obligatory disbursement agreements. Based on the above language alone, there is a position intermediate between that argued by the bank and that advanced by the Government, namely, that the bank would maintain a priority over the Government tax lien for property acquired after the filing of the tax lien but ac-

---

8. A so-called judgment lien is not a term specifically contemplated by the Uniform Commercial Code, *see* Tex.Bus. & Comm. Code Ann. § 9.104(8). But the judgment lien, as a standard against which a security interest competing with a federal tax lien is measured by section 6323, is properly analogous to a "lien creditor" if the judgment holder has actually acquired a lien under applicable state law:

"A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like. . . ."

Tex.Bus. & Comm.Code Ann. § 9.301(c).

9. Under Texas law it is possible that a judgment lien could attach automatically upon entry of judgment to property existing prior to the date of judgment on which a writ of attachment had been levied. *See* Tex.Stat.Ann. Art. 300; Midway National Bank of Grand Prairie v. West Texas Wholesale Co., 447 S.W. 2d 709 (Tex.Civ.App.1969). The writ of attachment, however, cannot be levied upon after-acquired property. *See* Tex. Stat.Ann. Art. 288; Smith & Co. v. Whitfield, 67 Tex. 124, 2 S.W. 822 (1887); Shaw v. Frank, 334 S.W.2d 476 (Tex.Civ.App.1959). *See also* Miss. Code Ann. § 1555.

quired pursuant to loans actually advanced prior to or within 45 days after the filing of the tax lien. For funds advanced after the 45 day period, the Government would take priority. Such a reading of section 6323(c)(4) would allow a commercial lender to claim only collateral for which it actually disbursed funds within the 45 day time period after the filing of the tax lien, thus preventing a security agreement on after-acquired property that might allow the commercial lender to take an infinite security interest in after-acquired property by contracting for a large paper loan and for protracted actual advancing of the loan funds. The history of the statute however, will not support that reading.

It appears clear that Congress contemplated not only that the funds must actually be advanced prior to or within 45 days of the filing of the tax lien, but also that the secured property must be "acquired" within that period:

> "The term 'qualified property', when used with respect to a commercial transactions financing agreement, includes only commercial financing security *acquired* by the taxpayer before the 46th day after the date of tax lien filing."

26 U.S.C.A. § 6323(c)(2)(B) [emphasis added]. The Senate Finance Committee in reporting the 1966 amendments concluded that " . . . protection is afforded only where the loan or purchase is made not later than 45 days after the tax lien filing . . . and only where the . . . accounts receivable . . . are *acquired* before the 45 days have elapsed." S.Rep.No.1708 *supra*, U.S.Code Cong. & Admin.News, p. 3729 (1966) [emphasis added]. Although it is not clear from the record whether the bank in the instant case had actually advanced funds to the taxpayer-debtor within the 45 day "grace" period, it is undisputed that none of the accounts receivable came into existence prior to April 13, 1970, 45 days after the filing of the tax lien.

Arguably, the bank could claim that its security interest was "acquired" when the loan agreement was reached. *See*

2 G. Gilmore, Security Interests in Personal Property § 45.5 (1965). In order to maintain that argument, however, the lender would have to contend that at the time of the tax lien filing "the debtor [had] rights in the collateral" in the present, even though the security itself might exist only in the future. Tex.Bus. & Comm.Code Ann. § 9.204(a). This problem, of course, ultimately relates to the choateness doctrine as it applies to the instant case.

The Supreme Court has maintained the integrity of the choateness doctrine, such as it is, throughout a number of amendments to the tax lien statutes:

> "The predecessor to § 6323 was first enacted by Congress in 1912 in order to protect mortgagees, purchasers and judgment creditors against a secret lien for assessed taxes and to postpone the effectiveness of the tax lien as against these interests until the tax lien was filed. H.R.Rep.No.1018, 62nd Cong., 2d Sess. [An amendment prompted, it appears, by the Supreme Court's decision in United States v. Snyder, 1892, 149 U.S. 210, 13 S.Ct. 846, 37 L.Ed. 705]. The section dealt with the federal lien only and it did not purport to affect the time at which local liens were deemed to arise or to become choate or to subordinate the tax lien to tentative, conditional or imperfect state liens. Rather, we believe Congress intended that if out of the whole spectrum of state-created liens, certain liens are to enjoy the preferred status granted by § 6323, they should at least have attained the degree of perfection required of other liens *and be choate for the purpose of the federal rule*."

United States v. Pioneer American Insurance Co., 1963, 374 U.S. 84, 89, 83 S.Ct. 1651, 1655, 10 L.Ed.2d 770, 775 [emphasis added]. It is settled law that the " . . . effect of a [state-created] lien in relation to a provision of federal law for the collection of debts owing the United States is always a federal question," whether or not the state law would

classify the private lien as specific and perfected. United States v. Security Trust, 340 U.S. 47 at 49, 71 S.Ct. 111 at 113, 95 L.Ed. 53 at 56.

"Otherwise a State could affect the standing of federal liens, contrary to the established doctrine, simply by causing an inchoate lien to attach at some arbitrary time even before the amount of the tax, assessment, etc., is determined."

United States v. New Britain, 347 U.S. 81 at 86, 74 S.Ct. 367 at 371, 98 L.Ed. 520 at 526. *See also* United States v. Acri, 1954, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264; United States v. Waddill, Holland & Flinn, 1945, 323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294. Thus, although a state's conclusion that a particular lien is specific and perfected ". . . is entitled to weight, it is subject to re-examination by this [federal] Court." United States v. Security Trust, 340 U.S. at 49–50, 71 S.Ct. at 113, 95 L.Ed. at 56. However, if state law itself would determine that a particular lien was not "acquired" or choate, in the federal sense of the terms, that determination would be "practically conclusive." Illinois ex rel. Gordon v. Campbell, 1946, 329 U.S. 362, 371, 67 S.Ct. 340, 345, 91 L.Ed. 348, 355. The Texas version of the Uniform Commercial Code provides that ". . . the debtor has no rights . . . in an account until it comes into existence." Tex.Bus. & Comm.Code Ann. § 9.204 (b)(4). The Uniform Commercial Code uses only the word "account," which is defined as ". . . any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." Tex.Bus. & Comm.Code Ann. § 9.106. Although "account" may be somewhat narrower than "account receivable," *See* Coogan, 81 Harv.L.Rev. at 1407, the difference between the two commercial terms is not substantive for purposes of the instant case. *See also* Tex.Bus. & Comm.Code Ann. § 9.103, comment 2, which appears to interchange the terms "account" and "account receivable" as their transactional genesis is con-

templated by the section. Both terms contemplate ". . . rights . . . for services rendered . . ." by the debtor that create a debt owing to the debtor by another party. *See* Tex.Bus. & Comm.Code Ann. § 106, comment; Chester v. Jones, 386 S.W.2d 544 (Tex. Civ.App.1965); Melinkoff, 77 Yale L.J. at 198–199. Thus, it is unlikely under Texas law that the money owed to tax-payer-debtor by Texas Oil & Gas could be considered "acquired" accounts or accounts receivable at the time of the filing of the tax lien or 45 days later on April 13, 1970, for prior to that date taxpayer-debtor had neither entered into a contract with Texas Oil & Gas nor rendered services. Even if the payment owing to taxpayer-debtor from Texas Oil & Gas could be considered "acquired" accounts receivable under Texas law by April 13, 1970, it also appears that state law would conclude that the bank's security interest could not finally attach until the accounts receivable came into existence, that is, until the services were rendered and the debt became owing. In addition, the performance by the tax-payer-debtor that underlies the accounts receivable in issue could not be considered a "contract right" at the time the tax lien was filed, for there was no contract between taxpayer-debtor and Texas Oil & Gas in existence at that time. *See* Tex.Bus. & Comm.Code Ann. §§ 9.106, 9.204(a); *see also*, Plumb, 77 Yale L.J. at 666; Young, "Priority of the Federal Tax Lien", U.Chi.L.Rev. 723, 743–748 (1967).

The most substantial present interest that the bank could claim in the accounts receivable at the time of the tax lien filing or within 45 days thereafter was that of a "general intangible." *See* Tex. Bus. & Comm.Code Ann. § 9.106. But the legislative history of the 1966 amendments to the tax lien statutes expressly excludes "general intangibles" from classification as "qualified property" of commercial financing security. H.R. Rep. No. 1884, 89th Cong., 2d Sess. 42 (1966); 26 U.S.C.A. § 6323(c) (2) (B).

Thus it appears that even state law would not render the bank's security in-

terest in taxpayer-debtor's accounts receivable sufficient to pass muster under the federal standards of choateness. The accounts receivable were simply not "acquired" at the required point in time, in this case within 45 days of the filing of the tax lien. This is not to imply in any way that the bank's security interest in the accounts receivable was not sufficiently perfected under state law. As we have pointed out earlier, it appears clear that no other action was required to maintain the bank's security interest in the future accounts receivable of taxpayer-debtor, Tex.Bus. & Comm.Code Ann. § 9.204(a), save that the accounts had to come into existence.

 Regardless of state law, it appears even clearer that federal law would not consider the bank's interest sufficiently choate to defeat the federal tax lien. In two cases that followed United States v. Security Trust, *supra,* the Supreme Court indicated a continued unwillingness to protect a private lien holder for nonobligatory agreements entered into prior to the filing of a tax lien but becoming fixed after the filing. United States v. Pioneer American Insurance Co., 1963, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770; United States v. Equitable Life Assurance Society, 1966, 384 U.S. 323, 86 S.Ct. 1561, 16 L.Ed.2d 593. Both cases involved the priority to be attached to attorneys' fees that accrued pursuant to mortgages that were admittedly superior to the federal tax lien. In *Pioneer American,* state law provided that the attorneys' fees became enforceable as an indemnity contract immediately upon default of the mortgage, and the default and the suit to foreclose the mortgage both occurred prior to the filing of the tax lien. Nevertheless, the Supreme Court held that the attorneys' lien was inchoate because it had not been reduced to a fixed amount at the time the tax lien was filed (pre-1966 amendments). In *Equitable Life* the attorneys' fees awarded pursuant to a foreclosure of the superior private mortgage, were based under state law upon a fixed percentage of the mortgage, which was a known sum. The Supreme

Court nonetheless concluded that Equitable's lien was inchoate, reasoning that there was no presently existing lien for attorneys' fees when the tax lien was filed because the mortgage had not been in default at the filing date. In both *Equitable Life* and *Pioneer American* the fact that the final transaction on which the private lien was allegedly based was not yet in existence at the time of the tax lien filing played an important role in the Court's reasoning. In the instant case, it is true that the bank had done all it could do under the Uniform Commercial Code to secure its interest in taxpayer-debtor's accounts receivable. However, that conclusion simply does not answer the case law as it has developed in the area of tax liens. However "complete" a lender's perfection may be under state recording laws and however "specific" state law might deem that interest to be, it is federal law that determines the extent to which that state determination will protect a private lien from a federal tax lien. It appears clear from the case law that an account receivable not yet "acquired" at the time of the filing of a tax lien because the final transaction creating the account receivable was not yet in existence cannot be considered choate, save for those accounts receivable now protected by section 6323(c). The Senate Finance Committee, speaking generally of the 1966 amendments, concluded that:

> ". . . [i]n the case of commercial transactions financing, the protection generally is afforded even though the property underlying the lien is not yet in existence or is turned over within a short time (45 days) after the tax lien filing as long as the loan . . . is made within this time."

S.Rep. No. 1708. Thus, it appears that Congress separated the transactions of lending and "acquiring" the secured collateral, requiring that both transactions be completed within 45 days of the filing of a tax lien. Since the accounts receivable were not "acquired" for purposes of the federal tax lien statutes until the work was performed for Texas Oil & Gas, the bank in the instant case

simply does not come within the judicial or statutory protection afforded to private lien holders in competition with federal tax liens.

Having lost on the 1966 amendments and on choateness, the bank's next argument is at least ingenious—if you cannot get a whole loaf under the applicable law, try for half-a-loaf by arguing the applicability of different law. The bank argues that the tax lien attaches only when its own lien attaches, that is, when the accounts receivable come into existence. From that premise the bank asserts that because it seeks only parity with the Government lien and not priority, it does not come within the scope of the tax lien amendments or the choateness doctrine at all. Neither the history of tax liens nor the language and history of the 1966 amendments to the tax lien statutes support that view. *See* Plumb, 77 Yale L.J. at 232, 648; Coogan, 81 Harv.L.Rev. 1373, supra. Section 6323 certainly was not enacted to decide dead heats among racing lien holders. If Congress intended to deal with liens on a basis of equality with the Government rather than priority, its legislative competence could have comprehended such a condition. The 1966 amendments provide for sudden death (inferiority) when neither the loan nor the security has federal existentiality prior to 45 days from the filing of the tax lien. Congress could not have intended that a piece of lien paper alone could always have parity with a Government lien. We further conclude that these amendments amount to a reasonably comprehensive statement of the lien position of the Government *in competition with* liens held or asserted to be held by private individuals, save principally for liens contemplated under the so-called purchase money doctrine. *See* H.R.Rep.No.1884, 89th Cong., 2d Sess. (1966). At no point in the history of tax lien litigation and legislation, at least after United States v. Security Trust,

*supra*, have we been able to discern a strain of the "parity" argument that the bank now advances, although occasions have arisen in which the argument might have been applied. If appellant's theory is accepted, lien documents of ancient lineage without any actual debtor relationship or physical security would be subject to rejuvenation at any time and for all time. We think that United States v. New Britain, *supra*, and section 6323(c) gave added potency to private liens competing with section 6321 liens, but did not make them invincible or half-invincible for all times and under all conditions. As the Supreme Court made clear in the case the bank urges so strongly:

> "[T]he priority of each statutory lien . . . must depend on the time it attached to the property in question *and became choate*."

United States v. New Britain, 347 U.S. 81 at 86, 74 S.Ct. 367 at 370, 98 L.Ed. 520 at 526 [emphasis added]. For the private lien holder, the security interest must both attach and be perfected under state law and be choate under federal law. The Government's tax lien attaches immediately upon assessment. 26 U.S.C.A. § 6322.[10] And a federal tax lien, duly filed, becomes enforceable immediately against all after-acquired property. *See* 26 U.S.C.A. § 6321, *supra* note 1. United States v. Pioneer American, *supra*; United States v. New Britain, *supra*; United States v. Security Trust, *supra*; *see also* Coogan, Hogan, Vagts, Secured Transactions under the U.S.C. § 12.03(1). It would be technically incorrect to describe the Government's enforceability as "choateness" under the traditional doctrine, but the immediate enforceability of a tax lien upon assessment and filing, 26 U.S.C.A. §§ 6322, 6323(f), serves the same function. Like the state-created lien, a federal tax lien attaches immediately to after-acquired property without any further action required by the Government. *See, e. g.,*

---

10. "Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C.A. § 6322.

United States v. New Britain, *supra.* And, like the state-created lien, a federal tax lien would be subject to execution only when the collateral came into existence, for only then would there be something on which to levy. Thus, even though the bank is correct in arguing that the Government, like the bank, cannot claim an immediately enforceable interest in non-existing property but can only wait until the accounts receivable come into existence before attempting to levy on its tax lien, the bank's argument stops short of dealing with the choateness problems inherent in a competing lien situation between tax lien and private lien. It does not appear to this court that the 1966 amendments to the tax lien statutes did away with the choateness doctrine of United States v. Security Trust, *supra.* The Supreme Court expressly rejected that inference after earlier amendments to the tax lien statutes. *See* United States v. Pioneer American, *supra.* Moreover, the bank is in a peculiar position to argue that the Uniform Commercial Code has had such an effect upon the prior doctrine. Not only is state law generally only referentially relevant to the *extent* of protection to be afforded to private liens in competition with tax liens, but also the bank has attempted to place itself entirely without the 1966 amendments that purport to mesh the tax lien statutes and the Uniform Commercial Code. The bank's assertion of "parity" with the Government lien, simply ignores the historical travels and travails of tax liens.

In short, the Government held an enforceable lien upon the taxpayer-debtor's accounts receivable on April 13, 1970, 45 days after the tax lien was filed. For purposes of this appeal, that is the date on which a still picture was taken of the bank's interest in taxpayer-debtor's accounts receivable. *See* United States v. Equitable Life, *supra*; United States v. Pioneer American, *supra.* And on that date the bank held a potential security interest in accounts receivable, which might or might not arise. The fact that the bank had done all that it could do under state law to protect its interest and the fact that the bank's lien would attach immediately upon receipt by the taxpayer-debtor of any after-acquired accounts receivable is only marginally relevant to disposition of the accounts receivable when the bank's lien is in competition with a federal tax lien. Because this potential interest in future accounts receivable cannot pass muster under the traditional choateness doctrine and because the 1966 amendments to the tax lien statute do not appear to expand that choateness doctrine in any manner other than to extend the required time of receipt for 45 days past the filing of the tax lien, the bank lien is inferior to the federal tax lien. The accounts receivable of the taxpayer-debtor were not "acquired," which is to say, "in existence or . . . turned over" prior to or within 45 days of the filing of the tax lien, S. Rep.No.1708, *supra*; and, as we read the statutes and the cases, that ends the matter.

Of course we realize that this disposition does not afford the protection that commercial lenders who deal with after-acquired property might prefer. As the law appears to stand, the commercial lender must check the applicable records every 45 days or else seriously jeopardize his security under the varying degrees of rigor promulgated by the choateness doctrine. Even that 45 day grace period is probably of minimal efficacy. Commercial lenders might often be lulled into a false sense of security with debtors who are doing badly, for it might appear to the lender that such a debtor is unlikely to have any income to tax. Yet it is precisely in these circumstances that back taxes are likely to accrue. In addition, the lender would most likely not have the entire 45 day period in which to act unless he were lucky enough to discover the tax lien filing almost immediately after it was filed. Finally, there is often not a great deal that the lender can do to protect his advances even after he discovers the tax lien in time. Of course, he has little control over the actual receipt of after-acquired property by the taxpayer-debtor, which is usually subject to contracts and contingencies entirely within the authority of the taxpayer-debtor and various third-parties.

The lender can attempt to substitute other existing collateral for his interest in after-acquired property if the taxpayer-debtor has any substitutable assets and if there is sufficient time.[11] Of course, however difficult the present amendments to the tax lien statutes might be to commercial lenders, the amendments offer greater protection to certain categories of lien holders and liens than were afforded by prior doctrines. But the whole genesis and historicity of section 6323(c) appears to have been to give only a slight handicap (45 days) to a private lien holder. The bank here did not establish its case under the choateness doctrine or under these statutory amendments, and the judgment of the district court awarding the accounts receivable fund to the Government by virtue of its tax lien is affirmed.

Affirmed.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

11. The American Bar Association proposed in 1959 that the lender should be protected against a tax lien to the extent of the value of the taxpayer-debtor's security as of the time of the tax lien filing.

Thus, the A.B.A. proposal would have allowed infinite substitutions of collateral after a tax lien filing in order to maintain the value of the security to that date. 84 A.B.A.Rep. 685 (1959).