960 F.2d 336
 69 A.F.T.R.2d 92-1120, 60 USLW 2647,
92-1 USTC P 50,199,
17 UCC Rep.Serv.2d 541
 RESOLUTION TRUST CORPORATION, as Receiver of First Federal
Savings and Loan Association of Pittsburgh,
v.
Dante GILL, Lisa Caputo, and United States of America,
Internal Revenue Service
Lisa Caputo, Appellant.
 No. 91-3439.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 27, 1992.
Decided March 31, 1992.
 
 Thomas A. Crawford, Jr., (argued), Pittsburgh, Pa., for appellant.
 Shirley D. Peterson, Asst. Atty. Gen., Joan I. Oppenheimer (argued), Gary R. Allen, William S. Estabrook, Susan E. Buechley, Thomas W. Corbett, Jr., U.S. Atty. (of counsel), Tax Div., Dept. of Justice, Washington, D.C., for U.S., I.R.S.
 Frederick J. Francis (argued), Beth A. Slagle, Meyer, Unkovic & Scott, Pittsburgh, Pa., for Resolution Trust Corp.
 Before: MANSMANN, HUTCHINSON, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal presents a set of unique circumstances which call into question the timeliness of the Government notice of levy upon the funds and IRA accounts of a delinquent taxpayer, and the competing rights of an alleged holder in due course to payment of checks drawn by a bank in closing out the accounts. Taxpayer Dante Gill maintained several IRA bank accounts with First Federal Savings and Loan Association of Pittsburgh (First Federal or the Bank).[1] The Government served notice of levy on First Federal at around the same time Gill closed her accounts and received two bank checks in return. Gill subsequently endorsed the two checks over to Lisa Caputo. When First Federal stopped payment on the checks and informed Gill that it intended to comply with the levy, Caputo came forward claiming rights to the funds as a holder in due course of the bank checks. In response, First Federal brought the present interpleader action, naming Gill, Caputo, and the Government as defendants.
 
 
 2
 The United States District Court for the Western District of Pennsylvania ruled that the Government was entitled to the interpled fund because the levy occurred prior to Caputo's receipt of the two checks. Caputo appeals, contending that there are genuine issues of material fact as to whether Gill closed her accounts after the Government served the levy notice and whether Caputo is a holder in due course. Because we agree with Caputo that these two genuine material issues of fact are unresolved, we vacate the order of the district court and remand for proceedings consistent with this opinion.
 
 I. FACTS
 
 3
 Between the years 1977 and 1984, the Internal Revenue Service (IRS) assessed taxes and penalties against Gill, and in 1985 and 1986 it recorded five tax liens aggregating in excess of $10.5 million against her in Allegheny County, Pennsylvania. According to the affidavit of IRS Revenue Officer Jacob G. Pifer, Gill met with him on March 28, 1989 to discuss the nature and extent of her assets so that the IRS could collect the delinquent taxes owed. During the meeting, Gill disclosed that she maintained IRA accounts at First Federal. After the meeting, Pifer prepared a notice of levy directed to First Federal demanding all of Gill's property or rights to property.
 
 
 4
 On the same day, IRS Revenue Officer Darryl Davis served the notice of levy on First Federal. His affidavit states that while in the lobby of First Federal, he recognized Gill standing in the reception area. He informed the receptionist that he was present to serve the notice of levy and she directed him to Kim Himmelreich, a legal department employee one floor above, on whom he served the notice of levy. The affidavit of IRA department employee, Donald Nemchick, avers that upon service of the levy, the legal department promptly telephoned the IRA department to inform it of the levy on Gill's accounts. However, the IRA department had just closed Gill's accounts and issued two "bank checks" payable to her in the amount of $97,153.94 and $15,151.64.[2] Before Gill had an opportunity to exit the Bank, Nemchick and another bank employee intercepted her and attempted to retrieve the two checks from Gill, but she refused to surrender them. Nemchick thereupon informed Gill that the Bank would stop payment on both checks.
 
 
 5
 Subsequently, Gill endorsed and delivered the two checks to Caputo. First Federal acknowledged that the Pittsburgh National Bank presented the checks to it for payment on behalf of Caputo and that it dishonored them. The Bank wrote to Gill notifying her that it intended to remit the funds in question to the IRS pursuant to the levy. Caputo's attorney responded by letter stating that the accounts were not subject to levy and instructed First Federal to honor the checks it had issued to Gill. Shortly thereafter, Caputo instituted a suit against First Federal in the Court of Common Pleas of Allegheny County, claiming that as a holder in due course of the bank checks, the Bank was liable to her for their payment.
 
 
 6
 Met with these competing claims, First Federal filed this action in interpleader against Gill, Caputo, and the Government. First Federal asserted that it had no interest in the monies in dispute, but was a mere stakeholder exposed to double liability and the expense of litigating conflicting claims in the dual forums. It sought an order: restraining each defendant from instituting any actions against First Federal for recovery of the amounts in controversy; requiring the defendants to interplead and settle among themselves their rights to the sums; discharging First Federal from all liability in the case; and granting First Federal its costs and attorney fees.[3]
 
 II. PROCEDURAL HISTORY
 
 7
 The Government filed a motion to dismiss First Federal's complaint for failure to state a cause of action. Prior to argument on the motion, First Federal obtained a default judgment against Gill for failure to plead or otherwise defend. At argument, the Government and First Federal reported that they expected to be able to resolve the motion amicably. Shortly thereafter, the district court granted First Federal's motion for a temporary order restraining Gill and Caputo from instituting or prosecuting any proceedings affecting the property or obligations involved in the interpleader action, specifically the claim Caputo had filed against First Federal in state court.
 
 
 8
 Caputo filed an answer to the interpleader complaint and included a new matter and counterclaim against First Federal. The new matter asserted that Gill endorsed the two drafts over to Caputo in payment for horse training and caretaking wages. Caputo alleged that she deposited the checks into her bank account at the Pittsburgh National Bank and then invested the total proceeds in the purchase of securities with a brokerage firm. She further alleged that her bank notified her and the brokerage firm that First Federal had stopped payment on the checks at which time the brokerage firm reversed the security purchases, sold the securities, and charged Caputo's account with commissions and other expenses involved in the transactions. She demanded judgment against First Federal for the amount of the two checks and the losses incurred as a result of the stop payment orders.
 
 
 9
 First Federal responded to Caputo's counterclaim and filed a petition requesting the court to permit it to deposit the stake into the court's registry and to discharge it from further liabilities or obligations. The Government filed a response stating that it did not oppose the discharge. It agreed to withdraw its motion to dismiss if First Federal deposited the funds in question into the court registry. Caputo filed an answer opposing the petition on the grounds that First Federal was liable to her not only for the amounts of the bank checks, but also for the investment losses claimed in the counterclaim.
 
 
 10
 The district court, on the magistrate's recommendation, ordered First Federal to pay the funds in question into the court registry and discharged the bank from any further obligations or liabilities involving the designated accounts or any transaction involving those accounts. The court stated, "There appears to be no question that the bank had the funds in Gill's account when it was served with the notice of levy." It reasoned that First Federal should have complied with the levy and discharged the Bank relying on 26 U.S.C. § 6332(d) of the Internal Revenue Code of 1989 which provides that any person who surrenders rights to property to the IRS pursuant to a levy is "discharged from any obligation or liability to the delinquent taxpayer and any other person with respect to such ... rights to property" arising from the surrender.
 
 
 11
 The district court stated that it was reserving judgment as to the respective rights of the Government and Caputo to the funds until First Federal deposited the funds into the court's registry. In accordance with the ruling, First Federal deposited $120,350.15 into the court's registry, representing the disputed funds with interest to the petition date.[4] The Government then filed a motion for summary judgment to which Caputo did not respond. The district court, on the magistrate's recommendation, relied on the affidavits of IRS Officers Pifer and Davis attached to the Government's motion and observed that Caputo had produced no evidence that the levy was not made before she received the checks from Gill. The court concluded that the Government therefore was entitled to the interpled funds and granted the Government's motion for summary judgment.
 
 III. DISCUSSION
 
 12
 Our review of the district court's grant of summary judgment is plenary. American Lumber Corp. v. National R. Passenger Corp., 886 F.2d 50, 52 (3rd Cir.1989). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Federal Rule of Civil Procedure 56(e) provides that where, as here, Caputo as an adverse party does not respond to a motion for summary judgment, the district court shall, if appropriate, enter summary judgment. However, where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented.
 
 
 13
 Caputo first argues that the district court erred in granting the Government summary judgment because a genuine issue of material fact exists as to whether there was money in Gill's account when the Government served the notice of levy. Caputo contends that if the Government served the notice of levy after First Federal had closed Gill's accounts, the levy attached to "empty" accounts and the Government's levy was ineffectual in seizing the funds in dispute. Caputo also argues that she is a holder in due course of the bank checks, and as such, she has a superior claim to the Government's lien on Gill's property.
 
 
 14
 A. The timing of the levy.
 
 
 15
 An administrative levy pursuant to 28 U.S.C. § 6331 is one of two statutory means by which the Government may collect unpaid taxes. United States v. National Bank of Commerce, 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985). Where the taxpayer's property is held by another, the Government customarily serves a notice of levy upon the custodian. The notice of levy gives the IRS the right to all property levied upon and creates a custodial relationship between the third party and the IRS so that the Government gains constructive possession of the property. Id. at 720, 105 S.Ct. at 2924. The IRS regulations provide that a levy is effective upon the IRS's service of the notice of levy. 26 C.F.R. § 301.6331-1(a) (1991). Unlike the second method of enforcing the collection of taxes, the lien-foreclosure suit, the levy occurs prior to any adjudication; therefore, it may occur prior to the determination of the parties' claims to the property. Michael J. Young, Note, Levying on Joint Bank Accounts: A Ticking Bomb for the Nondelinquent Joint Account Holder, 70 Minn.L.Rev. 1308, 1314-15 (1986). The levy is thus a speedy and powerful device to collect government taxes.
 
 
 16
 The administrative levy encompasses "all property and rights to property" belonging to a delinquent taxpayer or on which there exists a tax lien, 26 U.S.C. § 6331(a), but only to the "property possessed and obligations existing" at the time the Government serves the notice of levy. 26 U.S.C. § 6331(b). The Supreme Court has stated that the language of section 6331(a) "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." National Bank, 472 U.S. at 719-20, 105 S.Ct. at 2923-24. In applying the revenue statute, we must determine the nature of the taxpayer's interest in the property pursuant to state law. Id. at 722, 105 S.Ct. at 2925. Here, because Gill maintained her bank accounts in Pennsylvania, it provides the pertinent state law.
 
 
 17
 Under the Uniform Commercial Code (UCC), adopted in Pennsylvania, a bank account constitutes a contractual creditor-debtor relationship between the depositor and the bank. White & Summers § 18-1, at 864. Gill had the contractual right to withdraw the full amount of her IRA accounts at First Federal. First Federal, on its part, was obligated to pay the full amount upon Gill's demand or order.
 
 
 18
 Because the Government maintains that it served the notice of levy prior to the time that Gill closed her accounts and First Federal issued the bank checks, it asserts that it is entitled to the funds deposited in the registry of the court. A bank account is a species of property "subject to levy," within the meaning of section 6331. National Bank, 472 U.S. at 721, 105 S.Ct. at 2924. In addition, a right to withdraw qualifies as a right to property for purposes of section 6331. Id. at 725, 105 S.Ct. at 2927. Assuming that the levy preceded the issuance of the checks, the levy seized the funds in Gill's IRA accounts and transferred constructive possession of the funds to the IRS. This is the Government's position and the ruling of the district court. Although Caputo has not expressly agreed, her argument is consonant with this view of the levy. Her disagreement is with the Government's position and the magistrate's conclusion adopted by the district court that "[t]here appears to be no question that the bank had the funds in Gill's account when it was served with the notice of levy."[5] There is a serious question, however, on the record before us, as to whether Gill had closed her accounts out before the levy. The party in the best position to know, the Bank, refused to admit to the Government's request for admission that at the time the notice of levy was served on the Bank the funds in Gill's IRA accounts were on deposit. The Bank admitted only that on the day of the levy the funds listed were on deposit and stated that further response would involve it in a question of law for the court to determine.
 
 
 19
 Darryl T. Davis, the Revenue Representative who served the notice of levy, averred in his affidavit that he arrived at the Bank's legal department at approximately 1:00 p.m. on the day of the levy. When he arrived he saw Gill standing in the reception area of the legal department. The receptionist directed Davis upstairs to Himmelreich. Davis informed her that the taxpayer was downstairs and that the levy need to be acted upon quickly. He then left. About five minutes elapsed from the time he entered the legal department and his departure. Davis made no statement that he served the notice of levy prior to First Federal's issuance of the checks. Donald Nemchick, employed in the Bank's IRA department, stated in his affidavit that he was present when Gill arrived to withdraw the monies in her accounts and when Himmelreich telephoned to advise the IRA department of the levy. He stated that when the IRA department received the call, Gill was leaving or had left the department. We presume that when she left, she had possession of the checks. Nemchick too provided no information as to whether Gill's funds were still on deposit at the time of the levy.
 
 
 20
 Thus, whether Gill's funds were still on deposit at the time of the levy is a material issue of fact. The magistrate resolved the matter by noting that "Caputo has produced no evidence which can be considered on a motion for summary judgment, that the levy was not made before she received the two checks from Ms. Gill." The Government, however, has the burden of proof to show that all of the requirements of section 6331 of the IRS Code have been met. See White v. I.R.S., 790 F.Supp. 1017 (D.Nev.1990). Moreover, the account was Gill's and not Caputo's and it is the Government who claims that its levy preceded the closing out of the accounts. Therefore, logic and fairness place the burden of proof on the Government as to this issue.
 
 
 21
 In granting the Government's summary judgment motion, the district court made no finding of fact that the levy preceded the closing of the accounts or the issuance of the checks in payment of the funds on deposit, but only found that the levy occurred prior to Caputo's receipt of the bank checks. In addition, our plenary review of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" does not reveal that there is no genuine issue of fact as to the timing of the levy and that the Government is entitled to a judgment as a matter of law. See Fed.R.Civ.P. 56(c). Although the district court correctly concluded that the Government served the notice of levy prior to Caputo's receipt of the checks, it reached its conclusion on the unwarranted inference in its earlier decision discharging First Federal that the levy preceded the issuance of the checks. Because a genuine issue of fact exists as to the timing of the levy, summary judgment on this basis was inappropriate.
 
 
 22
 Because we must remand, we believe it appropriate to call to the attention of the district court another important question for its consideration to which the Government makes only marginal reference; it has neither been briefed by the parties nor ruled on by the district court. When First Federal issued the two bank checks in payment for the sums due on the accounts, its obligation to Gill to pay on the accounts became transformed into an obligation to pay on the checks. First Federal's signature appeared as the maker of the checks and it was contractually bound under the UCC to pay the holder of the checks. See Milton R. Schroeder, Bank Officers Handbook of Commercial Banking Law, p 20.05, at 20-19 (6th ed. 1989); White & Summers § 18-5, at 907.
 
 
 23
 At all times in question, First Federal continued to owe an obligation to Gill to pay a sum of money equal to the amount that existed in the IRA accounts, whether the accounts were open or had been closed in return for bank checks. Under the statute, the IRS levy attached to the Bank's obligation, regardless of the form; it was effective so long as Gill still had the right to call upon the Bank for payment of money or property. Therefore, even if the bank accounts were "empty" at the time of the levy, as contended by Caputo, the Bank's obligation to pay Gill was still full-scale. Now, however, it was in negotiable form and subject to the possible claim of a holder in due course.
 
 
 24
 Thus, if the levy preceded the closing of the Gill accounts, the Government obtained constructive possession of the funds and the subsequent issuance of the two checks, although inadvertent, may have subjected the Bank to a cause of action by a holder in due course.[6] Should the claimant succeed in the suit on the checks and obtain judgment, that judgment against the Bank can then be enforced like any other judgment. However, the judgment does not ipso facto entitle the successful plaintiff to the interpleaded funds paid into the court registry. On the other hand, if the Government levied after the accounts were closed out, then Caputo, if she succeeds in the interpleader proceedings as a holder in due course, is not merely a judgment creditor against a bank now in receivership, but is entitled to the specific funds paid into the court registry.
 
 
 25
 B. Caputo as a holder in due course.
 
 
 26
 Caputo also claims that she is a holder in due course with respect to the bank checks and that she therefore defeats the Government's lien against Gill's property. We would vacate the judgment of the district court on this basis only if Caputo could show that she is a holder in due course and then, only if a holder in due course defeats the Government's rights to the taxpayer's property.
 
 
 27
 As to the first matter, it may be that Caputo is a holder in due course. Under the Pennsylvania Commercial Code, Caputo qualifies as a holder in due course if she took the checks: (1) for value, (2) in good faith, and (3) without notice that the checks were overdue or had been dishonored or of any defense against or claim to the checks on the part of any person. 13 Pa.C.S.A. § 3302(a). Caputo allegedly received the two checks from Gill in partial payment for services as a horse trainer and caretaker. If true, these services qualify as value given. See id. § 3303(2) (payment of an antecedent claim constitutes value). In addition, Caputo alleges that she took the two checks in good faith and without notice of the Government's tax levy.[7] Id. These are all issues of fact the district court failed to address and we must remand for such consideration to determine whether Caputo defeats the Government's lien. In this connection, the district court may wish to consider that the levy had been made on the Bank's obligation to pay the checks and Gill had been informed by Nemchick before she left the Bank with the checks in hand that payment would be stopped on them.
 
 
 28
 A properly executed levy does not automatically entitle the Government to taxpayer property. The administrative levy is a "provisional remedy;" it "does not determine whether the Government's rights to the seized property are superior to those of other claimants," National Bank, 472 U.S. at 721, 105 S.Ct. at 2924, nor does the levy "determine the ownership rights to the property," id. at 731, 105 S.Ct. at 2930. See also 4 B. Bittker, Federal Taxation of Income, Estates and Gifts p 111.6.5, at 111-177 (2d ed. 1992) ("surrender of the property does not determine the priority of the liens, which can be settled in another forum"). The levy merely serves to protect the Government against the diversion or loss of such property until competing claims are resolved. National Bank, 472 U.S. at 721, 105 S.Ct. at 2924.[8]
 
 
 29
 As we observed above, if the levy succeeded the issuance of the bank checks and Caputo is a holder in due course, a competing claim exists to Gill's property. Once we ascertain the nature of the taxpayer's property rights under state law, we look to federal law to determine competing priorities to the property. Id. at 722, 105 S.Ct. at 2925. Under the express language of the tax lien statutes, a holder in due course has priority over a Government tax lien even though, as here, the Government filed notice of the tax lien prior to the negotiation of the checks. Section 6323 of the Internal Revenue Code, "validity and priority [of tax liens] against certain persons," provides in relevant part:
 
 
 30
 (b) Protection for certain interests even though notice filed.--Even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid--
 
 
 31
 (1) Securities.--With respect to a security (as defined in subsection (h)(4)) ...
 
 
 32
 (A) as against a purchaser of such security who at the time of purchase did not have actual notice or knowledge of the existence of such lien.
 
 
 33
 26 U.S.C. § 6323(b)(1)(A). Under subsection (h)(4), the term "security" includes a "negotiable instrument." 26 U.S.C. § 6323(h)(4). A "purchaser" is defined as "a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice." 26 U.S.C. § 6323(h)(6). "Money or money's worth" includes services. 26 C.F.R. § 301.6323(h)-1(a)(3).
 
 
 34
 Congress enacted the Federal Tax Lien Act of 1966, in part amending section 6323, in an effort to conform the lien provisions of the Internal Revenue Code to the concepts developed in the U.C.C. S.Rep. No. 1708, 89th Cong., 2d Sess. (1966), reprinted in, 1966 U.S.C.C.A.N. 3722. Under the U.C.C., a holder in due course takes a negotiable instrument "free from all claims to it on the part of any person." U.C.C. § 3-305(1). Such claims include liens. Id. Comment 2.
 
 
 35
 Caputo claims that she accepted the negotiable instruments as payment for wages owed and without notice of the federal tax lien. She has the burden of proving, however, that she comes within the exemption provision of section 6323. See Rice Invest. Co. v. United States, 625 F.2d 565, 571 (5th Cir.1980); Texas Oil & Gas Corp. v. United States, 466 F.2d 1040, 1054 (5th Cir.1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). She also has the burden of proof under section 3-307 of the U.C.C. If she can prove her alleged facts, the "shelter provision" of section 6323 protects her as a holder in due course of the negotiable instruments. See United States v. Estate of Swan, 441 F.2d 1082 (5th Cir.1971); Coventry Care, Inc. v. United States, 366 F.Supp. 497, 503 (W.D.Pa.1973).
 
 IV. CONCLUSION
 
 36
 The district court held that the Government was entitled to Gill's funds because it made the levy prior to Caputo's receipt of the two checks. However, entitlement of the Government, if any, to the funds depends not on when Caputo received the checks but whether the Government served the notice of levy before the accounts were closed out. It is evident that several genuine material issues of fact critical to the resolution of this dispute exist. Initially, the district court must determine the timing of the Government's service of the notice of levy on First Federal with respect to the closing of the Gill accounts. Depending on the timing of the levy, the court may need to further determine whether Caputo is a holder in due course, with respect to which she will have the burden of proof.
 
 
 37
 Accordingly, summary judgment entered by the district court will be vacated and the case remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Effective January 4, 1991, the Office of Thrift Supervision appointed the Resolution Trust Corporation (RTC) as receiver of First Federal. By order of this court, dated August 28, 1991, RTC was substituted as a party. For the purpose of clarity, we refer to the plaintiff as "First Federal"
 
 
 [2]
 A bank check is a check on which the bank is the drawer and the drawee is a second bank. 1 James J. White & Robert S. Summers, Uniform Commercial Code § 18-5, at 907 (3d ed. 1988) (hereinafter White & Summers)
 
 
 [3]
 Jurisdiction was based on 28 U.S.C. § 1331, the action having arisen under laws pertaining to federal tax liens, and 28 U.S.C. § 2410, conferring jurisdiction in interpleader actions involving personal property on which the United States claims a lien
 
 
 [4]
 The parties agree that by discharging First Federal from all obligations and liabilities with regard to the disputed accounts or any transactions involving those accounts, the district court effectively disposed of Caputo's counterclaim and new matter against the Bank. Thus, the district court's subsequent order granting the Government's motion for summary judgment was a final order from which Caputo could properly take appeal to this court
 
 
 [5]
 Caputo did not appeal the district court's May 25, 1990 order discharging First Federal from this case, and the sole issue raised on appeal is whether the district court's May 17, 1991 order granting the Government summary judgment was erroneous. Therefore, we have no occasion to address whether First Federal is liable to Caputo if it issued the bank checks subsequent to the Government's levy, or whether First Federal had the right to stop payment on its bank check. See generally Sheldon R. Shapiro, Annotation, Bank's Right to Stop Payment on Its Own Uncertified Check or Money Order, 97 A.L.R.3d 714 (1980). Neither do we decide whether the district court's discharge of First Federal was inappropriate, as Caputo now urges, because the Bank might have faced potential double liability
 
 
 [6]
 Because Caputo has not appealed the district court's dismissal of her counterclaim against First Federal, we need not decide the apparent conflict between 26 U.S.C. § 6332(d) which appears to discharge First Federal "from any obligation or liability to the delinquent taxpayer and any other person with respect to such ... rights to property" and U.C.C. § 3-305(2) which states that a holder in due course takes a negotiable instrument free from "all defenses of any party to the instrument with whom the holder has not dealt."
 
 
 [7]
 Thus, First Federal's stop payment order did not prevent Caputo from becoming a holder in due course unless she had notice of the dishonor. 13 Pa.C.S.A. § 3302(a)(3)
 
 
 [8]
 Although this court has previously stated that "[w]hen validly invoked, [the administrative levy] effects a seizure of a delinquent's property tantamount to a transferral of ownership," United States v. Sullivan, 333 F.2d 100, 116 (3rd Cir.1964), such an interpretation is clearly contrary to the Supreme Court's statements in National Bank; therefore we cannot, as the district court did, rely on it. See also Michael I. Saltzman, IRS Practice and Procedure, p 14.12, at 14-69 (2d ed. 1991) (as a result of recent Supreme Court cases, "the statements of some courts that a levy effectively transfers a substantial interest in property amounting to ownership are no longer correct")