Duncan Box & Lumber Company

*v.*

Applied Energies, Inc.,

*Defendant Below*

The First Huntington National Bank,

*Suggestee Below*

(No. 14097)

Decided September 16, 1980.

*Greene, Ketchum & Mills, George A. Mills, III, and Menis E. Ketchum,* for appellant.

*Huddleston, Bolen, Beatty, Porter & Copen, A. Michael Perry and Thomas H. Gilpin,* for defendant.

MILLER, JUSTICE:

The question presented by this appeal is whether, under our Uniform Commercial Code [UCC],[1] a bank can obtain a security interest in a depositor's reserve bank account which would prevail over a suggestee execution issued by a judgment creditor of the depositor.

The First Huntington National Bank [hereinafter Bank] agreed to finance, through a deed of trust, the purchase by Applied Energies, Inc. [hereinafter Debtor] of a tract of land known as Meadow Links Estates. With the purpose of subdividing the tract into lots for mobile home dwellers, Debtor sought further financing from the Bank for resale of the lots to individual purchasers. The proposal was that Debtor would assign the purchasers' promissory notes, secured by deeds of trust, to the Bank.

The Bank agreed to this arrangement, but insisted on security in the form of a "reserve account" to be controlled by the Bank which would, in effect, guarantee the Bank the right to a reserve of 25% of the unpaid balance of the outstanding notes. Payments into the reserve account would be accomplished by the Bank retaining 25% of the amount due Debtor on notes assigned by Debtor to the Bank from the sale of individual lots. The rules governing the reserve account were established by written agreement between the Bank and Debtor.[2]

---

[1] W. Va. *Code*, 46-1-101, *et seq.* The West Virginia Legislature originally adopted the Uniform Commercial Code in 1963. All material changes in the law will be signalled in this opinion by reference to the year of the amendment.

[2] The material provision of the agreement creating this account stated:

"[The Bank] shall have the right to deposit in a reserve account twenty-five percent (25%) of the amount otherwise payable to

Sometime after this arrangement between Bank and Debtor became effective, Debtor terminated its business. Subsequently, two creditors of Debtor, Ronald L. Eastham & Associates, Inc., and Duncan Box & Lumber Company [hereinafter Duncan], instituted separate proceedings against Debtor, obtaining judgments and proceeding by suggestee execution to attach the reserve account of Debtor in the Bank. The Bank contended the sum in the reserve account, approximately $41,000, did not exceed 25% of the unpaid balance owed by Debtor to Bank, which was roughly $400,000. The Bank thus asserted that Debtor had no "interest or property in the reserve account," and that the Bank was not "in possession of any property belonging to [Debtor]." The Circuit Court of Cabell County upheld the Bank's contentions and dismissed the proceedings. This appeal followed.[3]

Duncan argues that the Bank has no lien because it failed to file a financing statement under the general requirement of our Uniform Commercial Code, W. Va. Code, 46-9-302(1), which states, with enumerated exceptions: "A financing statement must be filed to perfect all

---

[Debtor] in connection with the assignments of the note and deed of trust to [the Bank]. The reserve account may be used by [the Bank] in [its] sole discretion to pay or satisfy any loss, cost, damages or expenses [it] might suffer or incur resulting from such a breach by [Debtor]. [The Bank's] determination as to the occurrence, cause and amount of such losses, costs, damages or expenses shall be conclusive. As to paper assigned or transferred to [the Bank] without recourse, as long as [Debtor] is not in default and all statements, representations, warranties contained in this agreement and the assignments contemplated hereunder are true, [Debtor's] liability to [the Bank] will be limited to the amount of funds deposited in the reserve account as altered from time to time as hereinafter provided. Every 12 months after the date of this agreement, if [Debtor] is not otherwise in default, all money in said reserve account in excess of twenty-five percent (25%) of the total unpaid balance on all paper purchased by [the Bank] from [Debtor], is payable to [Debtor] within a period of 14 days upon written request. Until paid under the preceding sentence, [Debtor] will have no interest in the reserve account and the funds deposited therein are otherwise non-withdrawable by [Debtor]."

[3] Duncan was the only judgment creditor to appeal the trial court's ruling.

security interests. . . ." The Bank asserts that a financing statement was not required because the reserve account falls within exception (a) of that Code section, which states "a security interest in collateral in possession of the secured party under section 9-305 [§ 46-9-305]."

At the time the reserve account was created in 1973, W. Va. *Code,* 46-9-305, provided generally that if a creditor took "[a] security interest in letters of credit and advices of credit . . ., goods, instruments, negotiable documents or chattel paper" and retained possession of the collateral, then he had perfected his security interest without the necessity of filing a financing statement.[4]

Duncan asserts the reserve account does not fall within this Code section because the account constitutes money, and that money was not within the statutorily enumerated items as this statute existed in 1973 when the agreement was executed. To buttress this point, Duncan calls our attention to the 1974 amendment to W. Va. *Code,* 46-9-305, which added the term "money" to the list of interests perfectible by possession.

These arguments, however, miss the critical point of the case. The agreement creating the reserve account was essentially a common law pledge. It is true that W.

---

[4] The full text of W. Va. *Code,* 46-9-305 [1963], is:

"A security interest in letters of credit and advices of credit (subsection (2) (a) of section 5-116) [§ 46-5-116 (2) (a)], goods, instruments, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this article. The security interest may be *otherwise perfected as provided* in this article before or after the period of possession by the secured party."

Va. *Code*, 46-9-102 (2), provides generally that Article 9, governing secured transactions, applies "to security interests created by contract including pledge . . . ."[5] But it is equally clear under W. Va. *Code*, 46-9-104(k) [1963], that certain transactions which may constitute a pledge are excluded from Article 9:

> "[Article 9 does not apply] to a transfer in whole or in part of any of the following: Any claim arising out of tort; any deposit, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization."[6]

The official comment to this section states in paragraph 7:

> "Rights under life insurance and other policies, and deposit accounts, are often put up as collateral. Such transactions are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law. Paragraphs (g) and (k) make appropriate exclusions."

The upshot is that the UCC does not apply to a pledge or transfer of a bank account, and thus the validity of such an arrangement is tested not by the UCC, but under the common law. This is the conclusion reached by courts which have passed on the question.

*Walton v. Piqua State Bank*, 204 Kan. 741, 754, 466 P.2d 316, 327 (1970), involved a purported pledge of funds in a passbook savings account. The court, after stating

---

[5] The full text of W. Va. Code, 46-9-102(2), is:

"This article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This article does not apply to statutory liens except as provided in section 9-310 [§ 46-9-310]."

[6] The 1974 amendments to this section moved the bank account exclusion to a separate subsection, (l), which excludes "a transfer of an interest in any deposit account (subsection (1) of section 9-105) [§ 46-9-105], except as provided with respect to proceeds (section 9-306) [§ 46-9-306] and priorities in proceeds (section 9-312) [§ 46-9-312]."

the statutory exceptions, acknowledged the inapplicability of the UCC:

> "Hence, no provisions of the Uniform Commercial Code are applicable to the question presented, and we refer to our decisions and to the Restatement of the Law, Security, as they apply the common law."

The court in *Wightman v. American National Bank of Riverton*, 591 P.2d 903, 906 (Wyo. 1979), discussed this question in more detail:

> "A pledge is recognized by the Uniform Commercial Code (U.C.C.). However, the U.C.C. does not deal with the rights and obligations arising out of pledges. Common law principles are used to fill this gap. 68 Am.Jur.2d Secured Transactions § 49, pp. 875-876. While the U.C.C. recognizes pledges, it does not specifically deal with the rights and obligations arising out of them. Moreover, § 34-21-904(a) (xi) [the Wyoming version of UCC 9-104(k)] specifically excludes the pledge of a savings deposit. Thus we are obliged to peruse the law of pledges in determining the matter before us ...."[7]

*See Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 557 n. 2, 561-63 (2d Cir. 1976); *United States v. Sterling National Bank & Trust Co. of New York*, 360 F. Supp. 917, 924 (S.D. N.Y. 1973), *modified on other grounds*, 494 F.2d 919 (2d Cir. 1974); 1 P. Coogan, W. Hogan & D. Vagts, *Secured Transactions under the Uniform Commercial Code* § 5A.14 (Bender 1980).

In light of the foregoing authority, we exclude a consideration of the UCC from our inquiry and proceed to consider the common law of pledges.

---

[7] The Wyoming court relied in part on UCC 1-103 [W. Va. Code 46-1-103]:

"Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

In *First National Bank of Parkersburg v. Harkness*, 42 W.Va. 156, 24 S.E. 548 (1896), we defined a pledge in Syllabus Point 1:

> "A pledge is a bailment of goods by a debtor to his creditor, to be kept by him until his debt is discharged."

We also discussed the distinction between a pledge and a mortgage:

> "Jones, Pledges, § 1, says: 'Every contract by which the possession of personal property is transferred as security only is to be deemed a pledge. . . .' * * * The distinction between a pledge and a mortgage is stated in Jones, Chat. Mort. § 4, as follows: 'The chief distinction between a mortgage and a pledge is that by a mortgage the general title is transferred to the mortgagee, subject to be revested by the performance of the condition; while by a pledge the pledgor retains the general title himself, and parts with the possession for a special purpose.' And the same author in his work on Pledges (section 7) says: 'A pledge differs from a mortgage of personal property in being a lien upon property, and not a legal title to it. The legal title to the property pledged remains in the pledgor, while a mortgage passes the legal title of the property itself to the mortgagee, subject to be revested in the mortgagor upon the performance by him of an express condition subsequent.' . . ." [42 W.Va. at 165-66, 24 S.E. at 552].

In *Bank of Mill Creek v. Elk Horn Coal Corp.*, 136 W.Va. 36, 40-41, 65 S.E.2d 892, 895 (1951), we reaffirmed the foregoing statements from *Harkness* in the context of a pledge of corporate stock, an intangible at common law.

Courts initially were troubled with the concept that a pledge of intangible property interests or choses in action could be obtained. The underlying concept of a pledge required physical possession by the creditor of the object pledged,[8] and hence the early reluctance by

---

[8] This point is made by P. Coogan in *Article 9—An Agenda for the Next Decade*, 87 Yale L.J. 1012, 1014-15 (1978):

some courts to find physical possession of something "intangible." As recognized in Annot., 53 A.L.R.2d 1396 (1957), the problem has been resolved through the concept of the "indispensable instrument":

> "Problems involved in the free transfer of intangible property interests have been substantially solved, as to a large class of such rights, by the introduction of the concept of negotiability, by virtue of which a document representing the right is vested with many of the characteristics of an actual chattel, and it seems to be settled that such a right may be pledged by delivery of the negotiable instrument which represents it. However, there remains a large class of intangibles which may in some sense be said to be represented by a commercial document which is not, however, negotiable, and the question is frequently presented whether such a right may be pledged by delivery of the document in question. This question may be answered simply, although not too helpfully, by saying that the courts generally recognize that if the document delivered does represent the right to the extent that it stands in the place of, or embodies, or reifies, the intangible, a pledge of the document amounts to a pledge of the right." [53 A.L.R.2d at 1398].

Both *Wightman v. American National Bank of Riverton, supra,* and *Walton v. Piqua State Bank, supra,* involved a type of bank deposit that was peculiarly susceptible to a pledge. *Wightman* dealt with a certificate of deposit, while *Walton* concerned a passbook savings account. In each case, the common law pledge requirements were found not to have been met because the pledgor had not made a sufficient transfer of the account.

---

"It was assumed that potential creditors and purchasers would rely on a debtor's apparent ownership of assets physically in his possession; this was part of the basic common law doctrine of protecting creditors against undisclosed interests in property. In other words, it was a requirement that there be public notice of the creation of a security interest; physical pledge, presumably, gave that public notice."

A case even more analogous to the present one is *Miller v. Wells Fargo Bank International Corp., supra,* where a claim was made that a time deposit in a bank could be pledged because the pledgee was the only party having a Telex key and key code which purportedly gave it sole physical control over the account. However, the court found there was not sufficient evidence "to establish that the Telex test key code gave [the purported pledgee] irrevocable authority over [the purported pledgor's ] account in Luxembourg." [540 F.2d at 563].

We have not had occasion to discuss the principles surrounding the pledge of intangible property. We do not doubt that in the ordinary case, where the intangible is represented by an indispensable instrument, the possession of such instrument must be transferred to the creditor-pledgee. This comports with the general definition of a pledge contained in Section 1 of the *Restatement of Security* (1941):

> "A pledge is a security interest in a chattel or in an intangible represented by an indispensable instrument, the interest being created by a bailment for the purpose of securing the payment of a debt or the performance of some other duty."[9]

However, in the case of a bank, which can create a deposit account, an intangible, and by specific agreement with the depositor, as in the case here, can obtain exclusive control over such account so as to employ it as a security device for the bank's loans to the debtor, the entire arrangement is functionally equivalent to a common law pledge.[10] We do not doubt that a different result

---

[9] Comment (e) to § 1 of the *Restatement of Security* (1941), explains that in order to have a valid pledge of an intangible, there must be possession by the pledgor of an "indispensable instrument," defined as "formal written evidence of an interest" in the intangible which so represents the intangible that "the enjoyment, transfer or enforcement of the intangible depends upon possession of the instrument."

[10] Some courts in a pledge context appear to treat the depositor-pledgor's funds in a bank account as a tangible object—money—and consequently have not discussed the indispensable instrument

would have been reached in *Miller v. Wells Fargo Bank International Corp., supra,* had the bank contending for the pledge established its exclusive control of the pledgor's bank account, notwithstanding the absence of a traditional indispensable instrument that represented the funds in the account.

In the commercial realities of the present case, the funds in the reserve account representing the pledged assets constituted security for the Bank's loans on the notes. The written agreement between the Bank and the Debtor manifests an unequivocal intention to permit the Bank to control the reserve account so that it might retain, without further consent or action on the part of Debtor, 25% of the amount due Debtor on the notes assigned by it to the Bank. The agreement creating the pledge is unmistakably intended to give the Bank collateral security.

Unlike a passbook or a nonnegotiable certificate of deposit, the written agreement here did not represent or embody the funds in the reserve account. However, it is not disputed that access to the reserve account was available only to the Bank. Under the terms of the written agreement, the Bank was required to pay on an annual basis to the Debtor any amount in the account which exceeded 25% of Debtor's total outstanding indebtedness to the Bank. This was not an account to which the pledgor had access, since it possessed no document which represented the account and which would enable it to transfer all or any part of the account. *See Miller v. Wells Fargo Bank International Corp., supra.*

concept for transfer of intangibles. *E.g., United States v. Harris,* 249 F. Supp. 221 (W.D. La. 1966); *Anderson v. Pacific Bank,* 112 Cal. 598, 44 P. 1063 (1896); *Walton v. Piqua State Bank,* 204 Kan. 741, 466 P.2d 316 (1970) (dissenting opinion); *Madsen v. Prudential Federal Savings & Loan Association,* 558 P.2d 1337 (Utah 1977). This approach may be adequate where the bank is shown to have exclusive control of the account and the depositor is given no access to the account, but it ignores the reality that a bank account is an intangible, since the bank does not physically hold a segregated amount of money for each depositor's account.

We conclude that where, as here, a bank, by agreement with its depositor, creates a reserve account with the depositor's funds as security for loans made by the bank to the depositor, and retains the exclusive possession and control over the account, such account meets the requirements of a common law pledge.[11]

Given our conclusion that the reserve account constitutes a valid common law pledge independent of the UCC, the claim of Duncan that the Bank did not file a financing statement as required by W. Va. *Code*, 46-9-302(1), must fail. There is no common law or statutory requirement in this jurisdiction which requires recordation of a non-UCC pledge. An essential purpose of recordation of a security interest is to put third parties on notice that the debtor's property is subject to a creditor's security interest. This reason for recordation, as we have previously noted, is not applicable where the physical possession of the property is not with the debtor, but with the creditor.

We have recognized in *First National Bank of Parkersburg v. Harkness*, 42 W.Va. 156, 24 S.E. 548 (1896), that a pledge will prevail over a subsequent attachment on the pledged property, stating in Syllabus Point 3:

---

[11] In a bank account where the depositor has access to the account through withdrawal rights, it would be difficult, if not impossible, for the bank to demonstrate that the account constitutes a pledge in the absence of a showing that it has exclusive control over the account. *See Cissell v. First National Bank of Cincinnati*, 476 F. Supp. 474, 490-91 (S.D. Ohio 1979). However, even in the absence of a pledge, the bank may still retain its common law right to a set off as to the depositor's account. *See Fletcher v. Rhode Island Hospital Trust National Bank*, 496 F.2d 927, 934-35 (1st Cir. 1974), *cert. denied*, 419 U.S. 1001, 42 L. Ed. 2d 277, 95 S.Ct. 320; *Aetna Casualty & Surety Co. v. Atlantic National Bank of West Palm Beach*, 430 F.2d 574, 577 (5th Cir. 1970); *Allied Sheet Metal Fabricators, Inc. v. Peoples National Bank of Washington*, 10 Wash. App. 530, 518 P.2d 734, 739 (1974), *cert. denied*, 419 U.S. 967, 42 L. Ed. 2d 183, 95 S.Ct. 231; 10 Am. Jur. 2d *Banks* § 666; *cf.* R. Skilton, *The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code*, 1977 So. Ill. U.L.J. 120, 186-88.

"An attachment subsequently levied upon [pledged property] would be subject to the lien created by [the] pledge."

It is the generally accepted rule, unless modified by statute, that the pledgee's right is superior to that of all subsequent lien holders or judgment creditors. *Stevan v. Union Trust Co.*, 316 F.2d 687, 690-92 (D.C. Cir. 1963); *Restatement of Security* § 28 (1941); 72 C.J.S. *Pledges* § 25; *cf. Reconstruction Finance Corp. v. Sun Lumber Co.*, 126 F.2d 731, 738-39 (4th Cir. 1942).[12]

For the foregoing reasons, the judgment of the Circuit Court of Cabell County is affirmed.

*Affirmed.*

---

[12] Since we have found the reserve account to constitute a common law pledge independent of the Uniform Commercial Code, Duncan's argument that the Bank failed to reduce its security interest to a judgment under *Code* 46-9-501, *et seq.*, is moot.