**CONGRESS TALCOTT CORPORATION,**
Appellant,

v.

**Gabriel GRUBER; Lawrence Herman;
United States of America,**
Appellees.

No. 92–1586.

United States Court of Appeals,
Third Circuit.

Argued Jan. 25, 1993.

Decided May 10, 1993.

Marvin Krasny, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, John P. McCahey, Thomas D. Gettler (argued), Hahn & Hessen, New York City, for appellant, Congress Talcott Corp.

James A. Bruton, Gary R. Allen, Gilbert S. Rothenberg, Janet A. Bradley (argued), U.S. Dept. of Justice, Tax Div., Washington, DC, for appellee, U.S.

Before: GREENBERG, ROTH and LEWIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

Title 26 U.S.C. § 6331(a) authorizes the government to enforce a lien on a taxpayer's property or rights to property by initiating an administrative levy. Here, we are asked to determine whether a taxpayer retains a property interest in monies held by a factoring agent as collateral for loans. We hold that he does, and that such funds are subject to attachment by tax levy under section 6331. Accordingly, we will affirm the district court's order granting the government's motion for summary judgment.

### I.

### A.

Gabriel Gruber and Lawrence Herman were controlling officers in the Seegull Manufacturing Company ("Seegull"), a maker of boys apparel.[1] In January 1987, Seegull filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Later, the bankruptcy court authorized Seegull to enter into a factoring agreement with Congress Talcott Corporation ("Congress"), a factoring company. Under the terms of this agreement, Congress would loan Seegull up to $250,000.[2]

In return for the loans from Congress, Seegull assigned its accounts receivable to Congress, granted Congress a security interest in its inventory and entered various other agreements. In a rider to the factoring agreement, the parties agreed that Gruber and Herman would pledge the sum of $100,000 as an additional guarantee of Seegull's obligations.

On March 16, 1987, Gruber and Herman signed identical cash collateral agreements to deposit funds with Congress to secure the loans extended under the factoring agreement. Pursuant to these agreements, Gruber deposited $89,510 and Herman deposited

1. Gruber was president of Seegull and Herman served as the company's secretary.

2. A factoring agreement enables a firm such as Seegull to sell or transfer its accounts receivable to a factoring company, such as Congress. They have traditionally been associated with the garment industry. The agreement typically is one of accommodation, as the factor may provide loans in anticipation of sales, for example. That appears to be the type of agreement at issue here.

$10,000 with Congress. Herman made further deposits, totaling $125,000, between March and December of 1987.

Several aspects of the cash collateral agreements are important to the resolution of this case. First, the factoring agreement is incorporated by reference into the cash collateral agreements. Second, the cash collateral agreements provided Congress with discretion to "appropriate or apply all or any part of the balance" of the monies deposited by Gruber and Herman as payment for Congress' obligations under the factoring agreement or any related agreement. The agreements vested Congress with discretion to appropriate the cash collateral for the satisfaction of claims "at any time" without prior notification to Gruber or Herman.

Another significant aspect of the cash collateral agreements was that interest which accrued on the collateral was added to the fund. Last, and perhaps most significant, the agreements provided that upon satisfaction of its obligation under the agreements, Congress would return any portion of the collateral fund still on deposit to Gruber and Herman.

The sums Gruber and Herman deposited with Congress were placed in a general operating account at Chemical Bank in New York. Neither Gruber nor Herman had access to this account. Congress established an internal accounting system to monitor all debits and deposits made on behalf of Gruber and Herman; it set up two internal accounts in their names and issued monthly statements reflecting debits, deposits and interest accrued.

### B.

The IRS made several tax assessments against Gruber and Herman in connection with employment taxes withheld from the employees of Giles Apparel, Inc., another company for which Herman and Gruber acted as controlling officers. It filed notices of tax liens against Gruber and Herman in October 1988, January 1989 and March 1989.

On December 27, 1988, the IRS served a notice of levy on Congress for "[a]ll property, rights to property, money, credits, and bank deposits now in [Congress'] possession and belonging to [Gruber as the delinquent taxpayer]." (Congress had not yet been served with a notice of levy on Herman's account.) The amount of taxes owed by Gruber totaled $120,320.74. When Congress received the notice of levy, Gruber's account balance was $53,920.99. Herman's account balance was $145,593.59. Congress responded to the notice by informing the IRS that it had a superior security interest in Gruber's deposits because of the cash collateral agreement and would comply with the levy only after Seegull's debt to Congress had been repaid.

Four months later, Congress withdrew $126,361.37 from the deposited funds in full satisfaction of Seegull's debts and obligations. Congress debited Gruber's internal account by $55,652.65, leaving a zero balance, and debited Herman's account by $70,708.72, leaving a balance of $69,378.49.

Fearing that an additional notice of levy on Herman's portion of the funds was imminent, Congress filed an interpleader action in the district court against the defendants-appellees, Gruber, Herman and the United States of America, claiming that it was subject to multiple liability for the $69,378.49 remaining in the deposited fund and seeking a determination of ownership of the funds.

In its answer, the government denied that Congress would be exposed to multiple liability if it complied with the levy. The government also filed a counterclaim and a cross-claim. In Count I of the counterclaim, the government asserted that Congress was liable to the United States for all property and rights to property in its possession which, on the date of the levy, belonged to Gruber. In Count II, the government sought to foreclose on all duly perfected "tax liens upon all property and rights to property of Gabriel Gruber and Lawrence R. Herman including the interpleader fund in [Congress'] possession...." Eighteen months later, the government was granted leave to assert an additional count for the wrongful conversion of funds subject to the tax liens, based on the claim that Congress continued to debit the interpled funds to pay its attorneys' fees.

The district court granted the government's motion for default judgment against

Gruber on December 13, 1990, and against Herman on March 19, 1992. On January 13, 1992, the government moved for summary judgment against Congress on the grounds that Congress had improperly refused to honor an IRS levy, that the government was entitled to foreclose its federal tax liens against the interpled fund, and that Congress had tortiously converted the tax liens that attached to the interpled fund when it debited the fund to pay attorneys' fees.

The district court ultimately held Congress liable for the $53,920.99, which represented Gruber's portion of the deposited funds. Once served with a tax levy notice, the court reasoned, Congress' only means of redress was either to surrender the funds to the government and file an administrative claim with the IRS, or file a wrongful levy suit against the IRS. The district court held that Congress could not bypass the legislative scheme on grounds that it had a superior interest in the property. Thus, as a possessor of Gruber's property when it was subject to federal tax lien, Congress was liable to the government for the sums it withheld plus interest from the date the levy was issued.

Congress appeals from the district court's order granting the government's motion for summary judgment. The district court had subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1340 and 2410. We have appellate jurisdiction under 28 U.S.C. § 1291. An order granting a motion for summary judgment is subject to plenary review. *Resolution Trust Corp. v. Gill,* 960 F.2d 336, 340 (3d Cir.1992).

## II.

### A.

The key issue is whether Gruber retained any cognizable property interest in the deposited funds which would subject them to

attachment by tax levy. Our analysis requires an application of the statutory principles concerning compliance with a federal tax levy issued pursuant to 26 U.S.C. §§ 6331–2. We begin our discussion with a brief review of the levy statutes.

■ When a taxpayer is delinquent in paying taxes, section 6321 of the Internal Revenue Code places the government in the position of a secured creditor and empowers it to impose a lien on "all property and rights to property" belonging to the taxpayer. 26 U.S.C. § 6321. To enforce its lien, the government may initiate an administrative levy under section 6331(a). When a taxpayer's property is held by a third party, section 6332(a) authorizes the government to serve a notice of levy on the third party.[3] Section 6332(a) provides:

> any person in possession of . . . property or rights to property subject to levy upon which a levy has been made shall, upon demand . . . surrender such property or rights to the [government], except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

A third party who honors the levy and surrenders the property has no liability to the delinquent taxpayer; however, failure to surrender the property upon service of a tax levy will render the third party personally liable to the government for the value of the property and for additional penalties if the noncompliance was not reasonable. *See* 26 U.S.C. § 6332(c)(2). Individuals served with a notice of levy may respond either by surrendering the property and instituting a wrongful levy action under 26 U.S.C. § 7426, or by filing an administrative claim with the IRS under 26 U.S.C. § 6343.

---

**3.** An administrative levy authorized under section 6332 has been described as a "provisional remedy." *United States v. National Bank of Commerce,* 472 U.S. 713, 721, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985). In contrast to a lien foreclosure suit, which is another enforcement mechanism available to the government under section 7403(a), an administrative levy does not determine whether the government's rights to the property are superior to others'; it

merely gives the government temporary custody of the property to protect against diversion until claims against the property are resolved. *Id.* Unlike *United States v. McDermott,* — U.S. —, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993), cited by the dissent, this case confronts the question of the imposition of a tax levy. We are not concerned with the problem of tax lien priority to which *McDermott* was addressed.

The Supreme Court has recognized only two defenses for a party who fails to comply with a tax levy. *United States v. National Bank of Commerce,* 472 U.S. 713, 721–22, 105 S.Ct. 2919, 2924–25, 86 L.Ed.2d 565 (1985). First, it is a defense that the property is already subject to "judicial attachment or execution" as set out in section 6332(a). *Id.* Second, a person holding property may defend by arguing that the levied property is not the taxpayer's "property or rights to property." *Id.* Under the second defense, even if others claim an interest in the property and the taxpayer's interest may be quantified as but a modicum, the property remains subject to attachment by levy and must be surrendered until ultimate ownership can be resolved. *Id.* Because federal law defines the consequences which attach to rights created under state law, it is commonly understood that in a levy proceeding, "the IRS steps into the taxpayer's shoes." *Id.* at 725, 105 S.Ct. at 2927 (citations omitted). Thus, "the IRS acquires whatever rights the taxpayer himself possesses." *Id.*

In this case, Congress refused to surrender the funds Gruber had deposited; instead, it debited those funds to satisfy the Seegull debt. The parties concede that the levied funds were not subject to prior judicial attachment. Therefore, the only defense available to Congress for failure to honor the levy is that the deposited funds were not "property or rights to property" belonging to Gruber at the time the notice of levy was served. *Id.* at 722, 105 S.Ct. at 2925.

Courts must apply state law to determine what interest, if any, the taxpayer has in levied property. *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960). Although state law governs this issue, as we have noted, federal law assigns consequences to rights created by local law. *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958). Thus, because the United States Congress meant to attach a broad meaning to the statutory language "all property and

rights to property," *National Bank of Commerce,* 472 U.S. at 719–20, 105 S.Ct. at 2924, courts must liberally identify property rights created under state law.

### B.

Congress' principal argument is that it had a right to set-off the debts owed by Seegull with collateral supplied by Gruber under the cash collateral agreement. Congress claims that the Seegull debt had matured, and that Congress had already obtained full right, title and interest in the funds by the date of the levy. If Gruber no longer had an interest in the property, the funds were not subject to attachment by federal levy.

In the absence of an agreement to the contrary, New York law requires that deposits made to a special account are to be returned to the depositor if they are not used for the purpose which underlies the special account.[4] *Noah's Ark Auto Accessories, Inc. v. First Nat'l Bank of Rochester,* 64 Misc.2d 944, 316 N.Y.S.2d 663 (Sup.Ct.1970). A federal tax levy may attach such a contingent interest. *United States v. Marine Midland Bank,* 675 F.Supp. 775, 780 (W.D.N.Y.1987). Thus, the question here is whether Gruber intended to transfer his interest in the funds outright or whether he merely intended to pledge the funds as collateral.

Under common law, a pledge is perceived as "a security interest in a chattel or in an intangible represented by an indispensable instrument, the interest being created by a bailment for the purpose of securing the payment of a debt...." *See Duncan Box & Lumber Co. v. Applied Energies,* 165 W.Va. 473, 270 S.E.2d 140, 145 (1980) (*citing* Restatement of Security, § 1). By a pledge, "the pledgor retains the general title himself, and parts with possession for a special purpose.... A pledge differs from a mortgage of personal property in being a lien upon property, and not a legal title to it." *Applied*

---

4. Although the transactions at issue in this case have connections with both New York and Pennsylvania, the appellant did not raise the choice of law issue before the district court. Because New York has the most significant contacts with the

transactions surrounding the cash collateral agreements, we will apply New York law to the question whether Gruber maintained any property interest in the levied funds. *See* Restatement (Second) Conflicts of Laws § 188.

*Energies*, 270 S.E.2d at 144 (*citing* Jones, Pledges, § 1).

▮] The cash collateral agreement between Congress and Gruber makes clear that although Congress had absolute control and discretion over the use of the funds, Congress was to return to Gruber any amount not applied to Seegull's debt once the debt was satisfied. Under the factoring agreement, Congress was assigned Seegull's accounts receivable. In the event Congress was able to collect all that it was due on those accounts, Congress was to return the balance of the collateral to Gruber and Herman. Thus, the arrangement between Congress and Gruber constituted a pledge.

In *Marine Midland*, the court addressed an almost identical issue under New York law. In that case, the bank had purchased installment contracts from a delinquent taxpayer. *Marine Midland*, 675 F.Supp. at 776. The parties agreed that the bank would apply a percentage of the credit service charges under the installment contracts to special reserve accounts established on the bank's books in the taxpayer's name. The taxpayer was not entitled to payment from the special reserve accounts unless the accounts' balances exceeded 10 percent of the unpaid balances of the installment contracts purchased by the bank. The bank argued that the reserve accounts "represented amounts not then payable to the [taxpayer] and which the [taxpayer] might or might not receive in the future depending on the bank's experience with the contracts it purchased." *Id.* at 780. The bank claimed that these contingent future interests were not "property" subject to levy.

In rejecting this argument, the court observed that although the right to payment was a contingent interest, the taxpayer had a "beneficial interest" and a property right under New York law. *Marine Midland*, 675 F.Supp. at 780; *see also Fine Fashions, Inc. v. U.S.*, 328 F.2d 419, 421–22 (2d Cir.1964). Applying the broad reading of the statutory

language required by the Supreme Court in *National Bank of Commerce*, the *Marine Midland* court concluded that although the taxpayer did not have an unqualified right to withdraw the full amounts in the reserve accounts, the property interest it did have was sufficient to subject the funds to attachment by tax levy. *Id.*

Congress argues that *Marine Midland* is inapposite. It claims that the Seegull debt had matured and, as a result, Gruber had already been divested of his property interest when the levy was filed. To support its argument, Congress offers evidence of monthly statements on Seegull's account which, it claims, indicate that the factoring relationship had ended because Congress had ceased advancing money. Congress also argues that the steadily increasing debit balance on the Seegull account indicates that Seegull had failed to repay the debt.

▮] If Congress had produced evidence that Seegull was in default and its outstanding debts were greater than or equal to Gruber's portion of the deposited funds, we would agree that any beneficial interest Gruber might have retained in the funds would be immaterial. In a levy action, if there is no balance remaining in a fund used to satisfy a creditor's outstanding claims, the taxpayer will not be considered to have a "property interest" in the funds. *Marine Midland*, 675 F.Supp. at 780; *see also Fine Fashions*, 328 F.2d at 422.[5]

The evidence of a default by Seegull is scant at best, however. That Congress did not choose to debit the accounts before the notice of tax levy belies its position that Seegull was in default and that Gruber was divested of his interest in the levied funds before that time. Although under New York law a party may lose the right to retain amounts in holdback accounts for failure to act promptly upon default, *Equimark Comm. Fin. Co. v. C.I.T. Fin. Serv. Corp.*, 812 F.2d 141, 145 (3d Cir.1987) (*citing Emigrant Industrial Savings Bank v. Willow Builders,*

---

5. The dissent's approach requires the district court to determine the extent or priority of the taxpayer's interest in the levied fund as a preliminary step to the attachment of the levy. Under the statutory scheme, however, such a determi-

nation is provided for, after the levy is made, by the filing of a wrongful levy action, 26 U.S.C. § 7426. *See Texas–Commerce Bank–Fort Worth, N.A. v. U.S.*, 896 F.2d 152, 156–57 (5th Cir.1990).

290 N.Y. 133, 48 N.E.2d 293, 299 (1943)), this concern, to the extent it ever existed, apparently failed to motivate Congress to debit the entirety of Gruber's account upon receipt of the levy notice. Indeed, the only action taken by Congress at that time was to communicate to the IRS that Congress had a superior security interest in the deposit. Congress took no steps to withdraw the balance in Gruber's account until four months after the levy was imposed.[6]

■ Although it is undisputed that the cash collateral agreement gave Congress unlimited discretion to apply the deposited funds in satisfaction of the Seegull debt, the important question is whether the parties intended to divest Gruber of his right, title and interest in the funds at the time he signed the cash collateral agreement and deposited the funds with Congress. The last paragraph of the agreement, which reserves in Gruber the right to recoup any monies not used in satisfaction of the debt, resolves that question in the government's favor. We conclude that it was the parties' intent that Gruber retain some interest, however small, in the funds.

Our conclusion is further supported by the payment and deposit scheme of the cash collateral agreements. Under those agreements, the parties gave Congress discretion to "appropriate or apply all or any part of the balance" of the monies deposited by Gruber and Herman as payment for Seegull's loans under the factoring agreement. Thus, Congress could not acquire Gruber's rights to the deposited fund until it debited monies to discharge Seegull's obligations. Although the monthly statements indicate that Congress had ceased advancing money and that Seegull had not been paying its debt, Congress has failed to establish that Seegull had defaulted on its debt. Thus, when the levy was filed, Seegull could still satisfy its obligations and Congress had not extinguished all of Gruber's rights to the fund by debiting his account. Gruber, therefore, retained an attachable property interest in the return of the deposited funds under New York law.

In sum, we conclude that under New York law, Gruber had a beneficial interest in the return of the monies on deposit contingent upon the full satisfaction of the Seegull debt. We hold that this beneficial interest is a property right subject to attachment by federal levy.[7]

6. In focusing on evidence of a possible default, the dissent argues that material issues of fact regarding Gruber's ownership and Congress' security interests remain in dispute and preclude summary judgment. In our view, the dissent elevates the inquiry to a level of hyper-scrutiny that is neither consistent with nor contemplated by a clearly defined legislative scheme focused primarily on prohibiting the removal or conversion of a taxpayer's property. We are constrained to adopt a broad application of that scheme by *National Bank of Commerce.* In any event, we find it significant that the record is devoid of any persuasive evidence that Congress assumed Gruber's interest in the fund because Seegull defaulted on its debt.

7. The factoring agreement was authorized by the Bankruptcy Court for the Eastern District of Pennsylvania. The dissent expresses concern with the district court's failure to determine the appropriate state law which governed the agreement. This concern, however, is of no moment. The conclusion that Gruber had retained an interest in the deposited funds would have resulted even if we had found that Pennsylvania law, instead of New York law, governed the parties' agreements.
Under Pennsylvania law, a bank's automatic right of set-off extinguishes the taxpayer's prop-

erty rights in his or her account when the obligation to the bank matures. *Pittsburgh Nat'l Bank v. United States,* 657 F.2d 36 (3d Cir.1981). Unless the parties otherwise provide, a demand obligation is mature at the time a levy is served if the taxpayer's debts exceed the funds then on deposit. *United States v. First Nat. Bank and Trust Co.,* 695 F.Supp. 194, 195 (W.D.Pa.1988) (a demand obligation is one which is due and payable immediately at the option of the holder; it is a mature debt at all times following execution and delivery since payment may be due thereafter without any demand).
In this case, the cash collateral agreements do not make payment due upon demand; instead, they permit Congress, at any time and in its discretion, to debit Gruber's account to satisfy Seegull's obligations. In our view, this provision postponed Congress' right of set-off until it had actually debited Gruber's account. *See General Electric Credit Corp. v. Tarr,* 457 F.Supp. 935 (W.D.Pa.1978) (parties to a demand note altered terms of demand obligation by contract; thus, where demand note specifically provided it would become "immediately due and payable" upon the happening of certain events, it was not mature until such events occurred). Since Congress did not debit Gruber's account until four months after the government served the notice of levy, Congress had no right of set-off under

### III.

Questions of law control the disposition on summary judgment in this case. The district court properly identified the key issue as whether Gruber had sufficient interest in the deposited funds to subject those funds to attachment by tax levy. The uncontested facts demonstrate that he did. Under these circumstances, we conclude that the district court properly entered summary judgment in the government's favor.

GREENBERG, Circuit Judge, dissenting.

The majority affirms the district court's grant of summary judgment to the government on the basis that Gabriel Gruber had an ownership interest in the fund he had paid over to Congress Talcott. However, the majority, like the district court, has not made an adequate inquiry into whether Gruber in fact had such an ownership interest under applicable state law. Since the argument of this case, further doubt has been cast on the government's broad assertions of the effect of its levy by the Supreme Court's analysis of a related problem of tax lien priority in *United States v. McDermott,* —— U.S. ——, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993). Because I believe that Gruber's interest must be defined by state law, and that the present record reveals conflicting facts relative to Gruber's interest, I would vacate the district court's order insofar as that court upheld the validity of the levy.

### I.

Some background concerning the general scheme of tax enforcement is necessary to an understanding of the possible effects of the IRS's liens and levy on the Gruber fund. A tax levy is one of the two principal means of collection used against recalcitrant taxpayers by the IRS, the other being foreclosure of a tax lien. The tax enforcement process begins with the IRS's assessment of taxes due but unpaid, under 26 U.S.C. § 6201. Upon such assessment and a demand for payment of the taxes, a lien arises by operation of law, pursuant to 26 U.S.C. § 6321, "upon all property and rights to property, whether real or personal, belonging to [the delinquent taxpayer]." However, the validity of that tax lien, vis-a-vis certain other specified creditors, is governed by the notice provisions of 26 U.S.C. § 6323. That section subordinates the tax lien to the interests of "any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor" unless notice of the tax lien has been filed, pursuant to Section 6323(f), in accordance with state procedures for filing real or personal property liens. The Supreme Court recently has interpreted the notice provision of Section 6323 as the *sine qua non* of a valid tax lien in instances where there is a competing lien: "[where] the competing state lien ... benefits from the provision of § 6323(a) ... we must deem the United States' lien to have commenced no sooner than the filing of notice." *United States v. McDermott,* —— U.S. at ——, 113 S.Ct. at 1528. In addition, even if a notice of the tax lien has been filed, a special priority nonetheless may be accorded to a later-arising "commercial transactions financing agreement," pursuant to 26 U.S.C. § 6323(c)(1)(A)(i).[1]

Once the government has a lien upon property of a delinquent taxpayer, it may enforce its interest by a foreclosure action as authorized under 26 U.S.C. § 7403. Such an action provides protection for other possible interests, in that 26 U.S.C. § 7403(b) requires joinder of all persons with liens upon, or "claiming any interest in," the property. The court then may finally determine all rights to the property and the priority of all interests; if the government is adjudged to have an interest, it can proceed to execute its

Pennsylvania law which extinguished Gruber's rights to the deposited funds at the time the notice of levy was served.

1. Factoring agreements apparently fall within this exception. *See, e.g., Texas Oil & Gas Corp. v. United States,* 466 F.2d 1040 (5th Cir.1972) (considering fuel-service accounts receivable to be within the statute, but finding that failure to "acquire" security interest within statutory time limit defeated claim of priority), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). The exception has not been invoked in our case, but the statute nonetheless may be instructive as indicating the preferred position given to commercial financing loans, even as against tax liens that would have priority over nearly any other claim.

judgment. Thus, the lien enforcement procedure entails orderly adjudication of any property interests that may compete with the government's tax lien, and affords substantial due-process protections to holders of such interests, requiring judicial determination of their rights and affording them full opportunity to be heard before the IRS may take possession of any disputed property.

The Internal Revenue Code also provides for emergent circumstances in which the collection of revenues could be frustrated by the removal or conversion of property to which the government rightly should be permitted to look for the satisfaction of tax obligations. Thus, the statute creates an alternate means of enforcing tax assessments, the tax levy permitted under 26 U.S.C. § 6331. The tax levy often has been characterized as a "provisional remedy;" it does not adjudicate competing rights in property, but does allow the government to seize and sell property of the delinquent taxpayer prior to such an adjudication. *See United States v. National Bank of Commerce,* 472 U.S. 713, 721, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985). Because a levy permits the government to take possession of property to which it ultimately may not be entitled, Section 6331 contains several safeguards. A levy usually cannot be made until the delinquent taxpayer has had at least ten days to pay an assessment. Levies upon salary normally can be made only after 30 days' notice to the taxpayer. While a lien follows the proceeds of the property, *see United States v. Bess,* 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958) ("[t]he transfer of property subsequent to the attachment of the lien does not affect the lien"), in contrast, "a levy shall extend only to property possessed and obligations existing at the time thereof." 26 U.S.C. § 6331(b). For example, a levy on a bank account only reaches the amount in the account at the time of levy; the levy does not extend to subsequent deposits by the taxpayer. 26 C.F.R. § 301.6331–1. A levy generally is effective "upon all property and rights to property ... belonging to [the taxpayer] or on which there is a lien ... for the payment

of such tax." 26 U.S.C. § 6331(a). Certain items of property, *e.g.,* limited personal effects, certain pension benefits, and a minimum amount of wages or salary, are exempt from a tax levy pursuant to 26 U.S.C. § 6334. Further, the statutory authorization for challenge by a third party served with a wrongful levy, 26 U.S.C. § 7426, by its terms permits the levy recipient to retain possession of the disputed property until a court may determine if the government has any rights therein. *Texas–Commerce Bank—Fort Worth, N.A. v. United States,* 896 F.2d 152, 156–157 (5th Cir.1990).

In our case, the chronology of tax enforcement proceedings culminating in the levy on the Gruber fund has crucial implications, depending upon the extent of Gruber's ownership interest in the fund at various points in the enforcement procedure. The cash collateral agreement, dated March 16, 1987, acknowledged a deposit by Gruber of $89,510.00. The district court found that between January 30, 1987, and March 31, 1987, Gruber had deposited with Congress Talcott a total of $133,326.62. Congress Talcott deposited all of the funds Gruber provided into its general operating account. Nevertheless Congress Talcott provided Gruber with monthly "account statements" reflecting the total collateral he had provided, set-offs for Seegull debts, and interest paid on the balance. As reflected on the account statements, Congress Talcott had debited the Gruber fund for substantial amounts to cover Seegull's debts. By the time of the levy, the Gruber account statement reflected a balance of only $53,920.99, far less than the total of Gruber's deposits.

Well over a year after the commencement of the Seegull factoring arrangement, the IRS made separate tax assessments against Gruber and Lawrence Herman, pursuant to 26 U.S.C. § 6201 and 26 U.S.C. § 6672, for unpaid payroll taxes of Giles Apparel, Inc.[2] The IRS made one assessment in the amount of $81,939.62 on July 18, 1988, and a second in the amount of $14,961.25 on September 19, 1988. The IRS filed a notice of its lien

**2.** Under 26 U.S.C. §§ 6671 and 6672, Gruber and Herman were controlling "persons" of Giles Apparel; thus, either would be personally liable

for the full amount of Giles' unpaid withholding taxes.

against Gruber arising from the first assessment in the amount of $81,939.62 in his county of residence, Camden County, New Jersey, on October 27, 1988.[3] Subsequently, the IRS filed a notice of its $14,961.25 lien against Gruber arising from the second assessment on January 17, 1989. The IRS served its notice of levy against the Gruber fund on Congress Talcott in the interim between the two lien filings, on December 27, 1988. The IRS never served Congress Talcott with a levy against the Herman fund. Although the total amount of the levy on the Gruber fund was over $102,000 and, as we have seen, Gruber had deposited over $130,000 with Congress Talcott, the government never has claimed any of the amounts deposited by Gruber beyond the $53,920.99 shown on Gruber's account statements at the time of the levy. It therefore appears that the government would concede that Congress Talcott had become the owner of at least some of the Gruber deposits, due to the deficiencies in the Seegull factoring account.

As explained above, the levy served on Congress Talcott would require the turnover of "all property and rights to property ... belonging to [the taxpayer] or on which there is a lien ... for the payment of such tax." 26 U.S.C. § 6331(b). Thus, even if Gruber had no ownership in the fund on the date of the levy, December 27, 1988, the levy would be valid against any property of Gruber to which a tax lien had attached prior to the time of levy.[4] Subject to certain exceptions, a lien would have arisen, pursuant to 26 U.S.C. § 6321, upon Gruber's real and personal property on the date of the assessments of the Giles Apparel tax delinquencies, *i.e.*, in the amount of $81,939.62 on July 18,

1988, and in the amount of $14,961.25 on September 19, 1988. The crucial exception would be that of 26 U.S.C. § 6323, recently defined in *McDermott, supra,* as preventing the government from having *any* lien against property already subject to the security interests enumerated in that section, until the government properly files its notice of lien. Even after filing, the tax liens might have been subordinate to certain claims arising from commercial transactions financing agreements, under 26 U.S.C. § 6323(c)(1)(A)(i).

Further, no lien could have attached to property that Gruber had conveyed in satisfaction of a just debt prior to the time of the tax assessments. *St. Louis Union Trust Co. v. United States,* 617 F.2d 1293, 1301 (8th Cir.1980) ("[p]roperty does not belong to a taxpayer and thus is not subject to lien and levy if it has been transferred before the tax assessment"). Therefore, the question of Congress Talcott's and Gruber's relative ownership interests in the fund at the time of the first assessment may well be determinative. If the monies paid over by Gruber, or some part of them, already had become Congress Talcott's property before the assessment of deficiency on July 18, 1988, then no lien would have attached to such funds that were no longer Gruber's, and no subsequent levy could reach such funds. In addition, if Congress Talcott had a security interest in the Gruber fund prior to the government's filing of its notices of liens, or if the government's notices were not effective as to property located outside of New Jersey, then under the Supreme Court's reasoning in *McDermott,* the government had no lien that could have served as the basis for a levy.[5]

---

3. Under New Jersey law, applicable by means of the notice scheme of 26 U.S.C. § 6323(f), a notice of lien filed in the debtor's county of residence is effective against all personal property located within New Jersey. *See* N.J.Stat.Ann. § 12A:9–401(1)(a) (West Supp.1992). Thus, the IRS's filing in Camden County may not have given it any priority rights in funds belonging to Gruber that were located in New York.

4. It is not clear why the majority (*supra* at 320 n. 5) thinks that my approach requires determination of property interests as a "preliminary step" to the validity of a levy. As the text above makes clear, the levy is automatically effective against

the taxpayer's property, or property that is subject to a prior tax lien.

5. On appeal, Congress Talcott has not challenged the district court's grant of summary judgment to the government on Count II of its counterclaim, foreclosing the tax liens against Gruber. However, the resolution of Count II does not affect the question of the validity of the levy because, as explained above, these liens would never have attached to any part of the fund that Congress Talcott already owned prior to the time of the assessments, or in which it had a security interest prior to filing of the notices of liens.

The above chronology demonstrates that, *pace* the majority's approach, it is no simple matter to determine whether the IRS's liens attached to, or its levy was effective against, some, all, or none of the moneys in the fund Gruber deposited with Congress Talcott. Certainly that determination cannot be made without closely examining whether any of the fund was Gruber's "property" on the dates of the levy or liens. There are many inconsistent facts in the record relative to whether Gruber owned the fund in the latter part of 1988, whether Congress Talcott clearly owned it all by that time, or whether each owned part of the amount at issue.[6] For example, the majority mentions, but gives short shrift to, the fact that Gruber's payments "were placed in [Congress Talcott's] general operating account at Chemical Bank in New York.... [and] Gruber [did not have] access to this account." (At 317.) The majority instead relies principally upon the conjecture that Gruber might have been due a refund if Congress Talcott had been able to collect Seegull accounts receivable in amounts exceeding all loans to Seegull and all interest and fees due to Congress Talcott pursuant to the factoring arrangement. Those contingencies never were fulfilled.

The deposit of Gruber's payments to Congress Talcott's bank account, to my mind, is so strong an indicium of Congress Talcott's ownership that, in itself, it creates a material issue of fact precluding summary judgment. But it is not the only fact of record that supports Congress Talcott's ownership of, or superior interest in, all or at least a substantial part of the fund by the time of service of the levy or filing of the notices of liens. The factoring agreement and the cash collateral

agreements permitted Congress Talcott to make up *any* deficiency in the Seegull loan transactions from funds deposited by Gruber and Herman, at any time. It seems apparent that the daily vagaries of factoring often would cause Seegull to be in a deficit posture, and therefore, by strict application of Congress Talcott's rights of set-off, Congress Talcott may have become owner of the entire Gruber fund long before the attachment of the first tax lien to Gruber's personalty or the service of the levy on Congress Talcott. Congress Talcott has claimed throughout this case that the property in the Gruber fund became Congress Talcott's either as soon as it had been paid over by Gruber, or as soon as sufficient deficits arose in the Seegull account to offset the amounts Gruber had deposited from time to time. Admittedly the fact that Congress Talcott sent Gruber "account statements" despite having deposited his payments into its own bank account, and the fact that Congress Talcott had agreed to pay Gruber interest on the funds, are inconsistent with Congress Talcott's ownership and would be evidence of a possible continuing interest of Gruber. It is also true that the immediate response to the levy by Congress Talcott, through its counsel, was a letter stating, *inter alia*, that "Congress [Talcott's] interest in the cash collateral account is superior to any interest the IRS may have in that account;" but that initial response surely does not foreclose Congress Talcott's consistent position throughout this litigation that it had become the owner of the total fund deposited by Gruber before tax deficiencies were assessed. While such conflicting evidence may mean that Congress Talcott's

---

6. Under certain circumstances, ownership of parts of an amount of cash can be segregated for purposes of a tax levy. *E.g.*, if Congress Talcott already had a matured right to ownership of 50% of the amount reflected on a certain Gruber account statement, but had not yet made a bookkeeping entry reflecting the changed ownership, then a situation may have arisen in which, say, $25,000 of a $50,000 statement balance was "owned" by Gruber, but $25,000 was "owned" by Congress Talcott. In other words, the Seegull factoring arrangement and the Gruber cash collateral agreement are *not* analogous to a joint bank account as to which each depositor has a right to withdraw all funds. *Cf. United States v. National Bank of Commerce, supra*, 472 U.S. at

726–27, 105 S.Ct. at 2927–28 (possible interests of bank account's co-depositors cannot defeat federal tax levy). Ownership of distinct amounts in a cash fund is also distinguishable from a situation involving less-than-fee interests in real estate, where any levy would attach to the entire underlying fee interest, even though the lesser interest might have a right to payment out of the proceeds of sale. *See United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) (federal court could order tax sale of real property despite state-law homestead interest of delinquent taxpayer's spouse, but spouse would be entitled to full compensation from proceeds of sale for loss of homestead interest).

assertion of ownership could not itself be determined by summary judgment, it certainly also means that a material issue of fact has been raised concerning who owned the fund at the time of the tax liens and levy.

## II.

Neither the majority nor the district court has analyzed sufficiently the nature or extent of Gruber's property interest in the fund under applicable state law. I believe such analysis is an inescapable prerequisite to determining whether the levy was valid. A federal tax levy can only reach "property" of the delinquent taxpayer or property to which a federal tax lien already has attached. 26 U.S.C. § 6321. Several Supreme Court cases have made clear that state law determines the "property" interest, and federal statutory law then determines the consequences of that interest, e.g., the attachment and priority of liens on the delinquent taxpayer's property. In *United States v. National Bank of Commerce*, 472 U.S. at 722, 105 S.Ct. at 2925, the Court summarized the proper application of state and federal law:

' "[I]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property." ' *Aquilino v. United States*, 363 U.S. 509, 513, 80 S.Ct. 1277, 1280 [4 L.Ed.2d 1365] (1960).... This follows from the fact that the federal statute 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.' *United States v. Bess*, 357 U.S. 51, 55 [78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135] (1958). And those consequences are 'a matter left to federal law.' *United States v. Rodgers*, 461 U.S. [677] at 683 [103 S.Ct. 2132, 2137, 76 L.Ed.2d 236]. '[O]nce it has been determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of [the statute], state law is inoperative,' and the tax consequences thenceforth are dictated by federal law. *United States v. Bess*, 357 U.S. at 56–57 [78 S.Ct. at 1057–58]. [Additional citations omitted.]

Thus federal law, e.g., the lien priority scheme of 26 U.S.C. 6323, certainly governs all questions as to whether the government's tax lien is valid and whether the government's interest can be superseded by one of the select group of other interests that are granted priority over tax liens. However, the basic requirement under both the tax lien and tax levy provisions, 26 U.S.C. § 6321 and § 6331, respectively, that there must be "property [or] rights to property" of the delinquent taxpayer in order for the lien or levy to attach, can be determined only by reference to the proper state law. This principle is demonstrated most clearly in *United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983). There, the Court determined the nature of a delinquent taxpayer's and spouse's property interests under Texas homestead law. Even though each spouse has a separate and undivided possessory interest in homestead property under Texas law, the Court found, in accordance with federal law, that a tax lien attaches to a homestead interest of the delinquent taxpayer, and that a court may order a tax sale of the homestead under certain conditions. This is so even though Texas law exempts homestead property from a forced sale. *Id.* at 700–01, 103 S.Ct. at 2146. Under *Rodgers*, it is clear that when the Supreme Court notes that the "consequences" of property rights are determined by federal law, it nonetheless is reserving all questions as to what constitutes "property" for determination under state law. *See, e.g., United States v. Bank of Celina*, 721 F.2d 163, 169 (6th Cir.1983) ("Although state law controls the issue of whether property exists to which a tax lien may attach in the first instance, federal law as explicated in *Bess* governs the question of how far an attached tax lien follows encumbered property.").

This court, where appropriate, may determine the correct choice of state law and apply that law. *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (appellate court must review *de novo* a district court's determinations of state law). But such a determination would not be appropriate in this case, both because the facts concerning ownership are disputed, and because the choice of state law is a layered and complex endeavor deserving of additional analysis by the parties and the

district court. The Seegull factoring agreement, which is incorporated by reference in the cash collateral agreement, contained a contractual choice of law of the state where the agreement was accepted by Congress Talcott. In supplementary briefs to this court, the parties' discussions have centered on whether Pennsylvania was the place of acceptance whose law therefore should apply to determine ownership of the fund.

However, determination of the correct choice of law would not be that simple, because the present record is quite unclear about where Congress Talcott accepted the factoring agreement. In this unusual situation, the parties have made a valid contractual choice of law, but rather than simply naming the state whose law applies, the parties instead designated the then-unknown state which was to be the location of a particular event in the formation of the contract. Therefore, a court first must use standard choice-of-law analysis to determine the location of the significant contractual event, *i.e.*, the acceptance of the factoring agreement by Congress Talcott. A court then would have to apply the law of the state of acceptance, in accord with the parties' contractual choice of law, to determine ownership and security interests in the Gruber fund at the relevant times of lien attachment and service of levy. In this situation, under the rule of *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a court first would apply the choice-of-law rules of the forum state, Pennsylvania, to determine what state's law would define the act of Congress Talcott's "acceptance" of the factoring agreement. The court probably would need additional facts to determine where the act of acceptance occurred. Only then could the court finally answer the question of what state's law applies by virtue of the parties' contractual choice of law.

Although determination of the proper choice of law is very complicated, it cannot be avoided. The majority incorrectly concludes, without analysis, that a simple "most significant contacts" test is adequate to determine that New York law applies. Even assuming that New York law would apply if a correct choice-of-law analysis were made, the majority places undue emphasis on a single case,

*United States v. Marine Midland Bank*, 675 F.Supp. 775 (W.D.N.Y.1987).

At this point, we simply do not know if principles governing ownership of bank accounts are relevant to the very specialized business of factoring. Further, the majority's application of *Marine Midland* is not accurate. In that case, the delinquent taxpayer had a contingent interest in any portion of a reserve bank account that might not be needed to repay installment contracts purchased by the bank from the taxpayer. The IRS served a notice of levy on the bank in October 1974. In early 1983, almost ten years later, the bank had made sufficient collections on the contracts to repay over $50,000 to the taxpayer. The court held that it was these funds, realized by the taxpayer after the contingencies had been fulfilled, as to which the levy was effective. In contrast, Congress Talcott maintains that the debts owing to it were never covered by collections of Seegull accounts and that no obligation to repay any funds to Gruber ever arose.

The majority treats the possible application of Pennsylvania law more summarily than New York law, dismissing in a footnote several cases decided under Pennsylvania law that strongly support Congress Talcott's position. *See, e.g., Pittsburgh Nat'l Bank v. United States*, 657 F.2d 36 (3d Cir.1981) (IRS levy against bank account was wrongful because, under Pennsylvania law, bank's right of set-off automatically extinguished depositor's rights in account as soon as depositor's debt to bank matured); *United States v. First Nat'l Bank & Trust Co.*, 695 F.Supp. 194 (W.D.Pa.1988) (IRS levy ineffective against taxpayer's certificate of deposit; under Pennsylvania law, taxpayer's property interest ceased when the bank acquired automatic right of set-off upon maturity of taxpayer's demand obligation to bank). Although the majority considers property interests in bank accounts to be relevant analogs under New York law, it then strains to distinguish the foregoing cases decided under Pennsylvania law.

One or two cases from each potentially pertinent jurisdiction—none of which deals with factoring agreements—simply are not a sufficient basis for determining Gruber's pos-

sible ownership interest under state law. The choice-of-law question in this case is too complex to be determined without a great deal of further analysis, which is a task for the district court, assisted by arguments of the parties, in the first instance.

### III.

Although courts are obligated to apply state law to determine whether property interests are sufficient to support the attachment of a federal tax levy, the district court never confronted that problem in this case. In addition, the record presents obvious conflicts of fact concerning Gruber's ownership and Congress Talcott's possible security interest, and an absence of the facts needed to determine the parties' contractual choice of law. I therefore would vacate the district court's grant of summary judgment on Count I of the government's counterclaim, and would remand the case for determination of the choice of state law and for application of that law to the apparently conflicting facts of ownership and priority of interests.